Habby E. Schirick, J.
Central New York Contracting Co., Inc., hereinafter called “Central,” was the successful bidder upon two State highway improvement contracts. These have been referred to as the “ Wayne County job ” and the “ Cayuga County job ” respectively. Surety bonds for the contractor’s performance and payment of materialmen were written by Newark Insurance Company (Newark). The bituminous materials for the performance of the highway jobs were supplied to Central by the General Crushed Stone Company (General). At issue in the present actions is the liability of Newark to pay to General the sums alleged to remain unpaid for materials supplied on such highway jobs. The defenses affirmatively asserted by Newark are: (1) That fraud was practiced upon Newark by General. (2) That by reason of General’s participation in unlawful diversion of trust funds by Central it is barred from enforcing its remedy against the surety. (3) As a partial defense, Newark asserts that it should be credited with the sum of $23,569.44, part of a payment made by Central to General on October 28, 1959, which portion Newark claims was derived from the Wayne County job.
From the time of its incorporation in 1951 to March, 1959 the affairs of Central were conducted by Frank Barry and Bussell Mahler. Barry was a broker for Barrett bituminous products *268 and Central’s purchases were at first almost exclusively from Barrett. Gradually, however, an increasing portion of Central’s purchases was made from General. In 1957 such purchases had risen to $321,356.87, in 1958 to $321,269.55 and in 1959 to $697,265.66. Despite increased operations, Central’s financial position steadily worsened. At the end of 1956 it owed a balance to General of $118,320. The 1957 balance was $160,787 and the balance at the end of 1958 was $199,716. The delinquent condition of such account occasioned many meetings between representatives of Central and General. In 1957 a promissory note was given. General refused to accept a note in 1958 but accepted postdated checks instead. General pointed out, truthfully, that it was its financial backing that permitted Central to remain in business and complained that it was not fitting for Central to purchase from its competitor, Barret. By the Spring of 1959 it had become clear that Central’s operating losses were steadily mounting. Frank Barry removed himself from the affairs of Central, selling his one-third stock interest therein to Mahler for the nominal consideration of $1. This eliminated all competing influence in the affairs of Central and thereafter its purchases were almost exclusively from General. Central’s precarious finances continued to be the subject of conferences with representatives of General. It was evident that Central’s continued operations were dependent entirely upon General’s indulgence and financial support. Mahler insisted upon and secured General’s commitment to continue such support as a condition of his continued participation in Central’s operations.
Experience had shown as early as the end of 1957 that Central could not pay for the materials upon any given job from the proceeds of such job. While payment was customarily received from the State within 90 days after completion, Central’s payments to General were a year or more behind. General’s anxiety over the state of the Central account was manifested in several ways. One was the frequent meetings involving General’s top officials. Another was the vigilance of its local representative Van Cleve to check upon the completion and acceptance dates of each job and to ascertain when each payment was due to Central from the State. The testimony shows that Van Cleve’s information in this respect was superior to Central’s. Van Cleve’s practice was to inform Mahler or Barry in advance of each payment as to the amount to be received and to instruct Central as to the job to which it was to be applied. This was invariably the oldest job in point of time. The aim, expressly stated, was to insure that no bill should remain unpaid beyond the date when a lien could be filed. In this manner General *269 sought to assure payment by the surety if Central could no longer pay old bills with new moneys. The inevitable occurred in December, 1959 when General filed a lien on the Wayne County job. The following March 31 it filed a lien on the Cayuga County job. The result was to put Central" out of business. The total balance owing by Central to General at the end of 1959 was $402,175.73.
The evidence is clear that Central had kept going by the practice of paying old accounts with the proceeds of new work. This was not only known to but was directed by General. At a meeting held in April, 1959 Central acknowledged its insolvency. General agreed," nevertheless, to continue shipments so long as no account was permitted to extend beyond the lien date.
During 1959 Central made eight payments to General, commencing July 16. These, together with payments made on July 27 and September 2, were devoted to the extinguishment of the previous year’s balance although the money was in large part derived from operations of the current year.
The source of the funds was disregarded by payor and payee alike in allocating the payments as received.
General’s complete disregard of the statutory trust provisions (Lien Law, § 25-a, now § 70) was exhibited by its proposals to Central in January, 1960. It was then suggested that Central assign to it all the moneys to be received upon a Monroe County job, despite the fact that claims for labor and materials would be incurred upon such job.
While a total of almost $200,000 was received by Central upon the Wayne and Cayuga jobs, no part thereof was applied to the payment of General’s invoices upon such jobs. It could not be, because Central’s payments were, at General’s insistence, always applied upon past-due balances.
The evidence establishes that General aided and abetted Central in the violation of the trust provisions of the Lien Law. Its conduct enabled it to secure payment of old debts; it also enabled Central to incur the obligations here in suit. Under equitable principles General should not be permitted to profit from its own misdeeds (Grace v. Corn Exch. Bank Trust Co., 287 N. Y. 94 [1941]).
That Newark would not have written the bonds if it had known of such practice is beyond dispute. Nor can it be questioned that the bonds would have been refused if the surety had known what General knew of Central’s precarious financial position. General could not have been ignorant of this and it was its duty to disclose the facts to Newark. To conceal them under such circumstances constitutes fraud (Phillips v. United *270 States Fid. Guar. Co., 200 App. Div. 208 [3d Dept., 1922], affd. 234 N. Y. 618; Matter of First Citizens Bank & Trust Co. v. Estate of Sherman, 250 App. Div. 339 [4th Dept., 1937.]; Damon v. Empire State Sur-, Co., 161 App. Div. 875 [2d Dept., 1914]).
I direct judgment in favor of the defendant Newark Insurance Company.