B. G. EQUIPMENT CO., INC., Respondent-Appellant, v AMERICAN INSURANCE COMPANY, Appellant-Respondent.

Fourth Department, February 17, 1978

248

---

## APPEARANCES OF COUNSEL

*McGrath, Meyer, Lieberman & Lipp, P. C. (Howard L. Meyer* of counsel), for appellant-respondent.

*Woods, Oviatt, Gilman, Sturman & Clarke (Percival D. Oviatt, Jr.,* of counsel), for respondent-appellant.

## OPINION OF THE COURT

DILLON, J.

The defendant appeals from a judgment awarded to the plaintiff B. G. Equipment Co. Inc. (BG) in the sum of $104,617.42, and the plaintiff cross-appeals on the ground that the judgment is inadequate by the sum of $19,174.

In January, 1972 Jespersen-Rochester, Inc. (JRI) contracted with Building Systems Housing Corporation of New York (BSHC), the prime contractor, to erect concrete building panels in connection with the construction of an apartment project in the City of Rochester. In May, 1972 the defendant executed a payment bond, as surety, for the benefit of suppliers of labor and material on the project. BG provided labor and rented certain equipment to JRI. The major rental item was a traveling tower crane for which JRI was to pay $6,848 a month. It became apparent during performance of its contract with BSHC that the financial condition of JRI was weak. It eventually went out of business without completing its work on the project and without paying BG. This action was commenced by BG solely against the defendant, based upon the payment bond.

Several issues are presented which require our consideration. Initially, we reject the defendant's claim that a mistrial was warranted based upon the ex parte submission of a trial memorandum to the court by BG's counsel. While it is argued that such conduct is acceptable under the standards of local custom and practice, nevertheless, a copy should have been furnished to the defendant (see Code of Professional Responsibility, DR 7-110). The court unequivocally stated, however, that the trial memorandum was not considered in making its determination (see Code of Judicial Conduct, canon 3 A [4]). Moreover, the defendant had ample opportunity to respond to the memorandum prior to the court's decision and we conclude, therefore, that the decision was not unfairly influenced by counsel's ex parte communication with the court.

Relying upon *General Crushed Stone Co. v State of New York* (46 Misc 2d 266, mod 23 AD2d 250, revd and judgment of Supreme Court reinstated 19 NY2d 737), the defendant next claims that JRI violated the trust provisions of the Lien Law and that it was aided and abetted in doing so by BG. In this

connection, however, the defendant has failed to satisfy its burden of proving a violation of the Lien Law. It failed to establish that JRI's books of account do not "show the allocation to each trust of the funds deposited in [its] general or special bank account or accounts" (Lien Law, § 75, subd 1). Nor does the record establish any actual diversion of trust funds by JRI. Such a diversion occurs when the trustee utilizes a trust asset for a nontrust purpose before payment of all trust claims (Lien Law, § 72, subd 1). While it appears that the bank account, which commingled trust assets with other moneys, was reduced by JRI's expenditures for items obviously disassociated with the trust, it does not necessarily follow that JRI received sufficient funds to pay its suppliers but diverted them elsewhere.

The defendant also contends that BG's execution of a waiver of lien constituted a representation that JRI had paid all sums then owing to BG. In support of this argument, the defendant introduced evidence that custom and usage in the construction industry requires that a waiver of lien be interpreted as a representation of payment. The waiver, however, simply "waives and releases all lien or right of lien" and contains no language which might be construed as a representation of payment. Its terms are clear and unambiguous, and thus custom and usage may not be relied upon to vary the express language of the waiver (*Matter of Western Union Tel. Co. [ACA]*, 299 NY 177, 184; *International Harvester Co. v Town of Ellery*, 28 AD2d 1081; see Richardson, Evidence [10th ed], § 627). The waiver of lien extinguished BG's right to file a lien. Viewed alone, it does not bar the assertion of a claim for personal judgment (*MacArthur Concrete Pile Corp. v Kew Queens Corp.*, 276 App Div 1015; *Cummings v Broadway-94th St. Realty Co.*, 233 NY 407, 412, rearg den 234 NY 534; *Tager v Healy Ave. Realty Corp.*, 14 AD2d 584, 585; see Lien Law, § 54).

This is not to say, however, that the waiver of lien must be disregarded in considering the totality of facts before us, particularly in light of the relationship of Richard G. Bennett with both BG and JRI, as well as his conduct and knowledge in this whole transaction. The defendant forcefully argues that Bennett's role, coupled with the conduct and actions of both BG and JRI, requires that BG be estopped from recovery. We agree.

Bennett is president of BG which is wholly owned by

Stewart & Bennett, Inc. Bennett is the chairman and treasurer of Stewart & Bennett, Inc. and owns 70% of its stock. Bennett was also JRI's treasurer until September, 1973 when he became its president. One third of JIR's stock was owned by Stewart & Bennett, Inc.

Although Bennett maintains that he was not an operating officer of BG, he was directly involved in aspects of its financial activities, at least to the extent of signing notes on behalf of BG in connection with its bank loans. Additionally, he discussed the purchase of the crane used on this project with the manager of BG and signed a note for over $100,000 in his capacity as president of BG, to obtain the funds used for its purchase.

Moreover, by August, 1973, he was aware of and concerned about the amount BG was owed by JRI. It was because of that concern that a decision was made to find new investors for JRI in order to pay its debts to BG and others. Although payments were made to other creditors, JRI made no payment to BG during the entire term of this contract, including the period of Bennett's presidency, except for a token sum paid in consideration of the waiver of lien. Despite his role as president of BG, Bennett testified, incredibly we believe, that BG was not paid because its managing officer, William Wesley, was not sufficiently assertive. It is acknowledged, however, that both he and Wesley were aware that this project was bonded and, indeed, Wesley admitted that his execution of the waiver of lien might have been "flavored" by such knowledge.

Bennett also professed that he was not an operating officer of JRI until September, 1973. It was established, however, that he attended a meeting on behalf of JRI with representatives of BSHC and the defendant on August 14, 1973 and it was at that meeting that Bennett falsely represented that JRI's suppliers had been paid. Interestingly, BG's waiver of lien was executed two days after that meeting in consideration of $954.60 when, in fact, the sum owing BG at that time was in excess of $52,000. Additionally, Bennett was aware that JRI submitted affidavits to BSHC, each of which recited in part that all of JRI's "materialmen, employees and sub-contractors have been paid all sums due them to this date". These affidavits were furnished by JRI from the very beginning of the project in order to obtain the payment of funds from BSHC, and there is no question that Bennett was aware of their falsity in that he knew that BG had not been paid.

Significantly, two such false affidavits were submitted on August 14, 1973 and were continuously submitted thereafter and during Bennett's tenure as president of JRI. The last such affidavits were furnished on December 20, 1973, only a few weeks before JRI abandoned the project.

The review of BG's conduct discloses that although it sent a proposed written contract to JRI specifying the terms of the crane rental, that written agreement was not returned by JRI. Nevertheless, JRI retained the crane in accord with the understanding of BG that it was to be paid a monthly rental of $6,848 in advance. Despite the fact that no such payments were made BG exerted no effort to collect the amounts due from JRI and continued to allow JRI to use the crane for almost one year. BG's managing officer proffered no plausible explanation for such strange sufferance but testified that his failure to pursue aggressively the collection of this account might have been "flavored" by Bennett's relationship to JRI.

It is evident that Bennett's paramount interest was in the financial stability of JRI and that its cash flow problems motivated him to take over the operation of JRI. It is also apparent that BG was used to assist JRI in surmounting its financial difficulties and that the economic risk of BG's assistance was channeled to the defendant by JRI's deceitful conduct. While Bennett was aware of and participated in this conduct, BG maintains that his knowledge may not be imputed to it. We do not agree.

Although Bennett was not the chief operating officer of BG, his scope of authority as president did embrace certain of its financial affairs. Bennett was personally involved in the purchase of the tower crane on behalf of BG and knew that it had been rented to JRI. His first hand knowledge that JRI falsely represented that BG had received its rental payments should in such circumstances bind BG. Since the subject of the crane rental was specifically related to his agency with BG, it is presumed that Bennett fulfilled his responsibility to protect BG's financial interests by advising it of JRI's misrepresentations (see *Benedict v Arnoux*, 154 NY 715, 728-729, rearg den 155 NY 635). Although Bennett maintains that he was acting exclusively on behalf of JRI, he may not be allowed to disavow his subsisting relationship with BG, particularly with respect to a matter bearing upon his duties with that corporation. While it is recognized that a corporation may not be charged

with the knowledge of its officers simply because they know of the subject and because they are its officers *(Title Guar. & Trust Co. v Pam,* 232 NY 441, rearg den 233 NY 530), the knowledge here imputed fell within the scope of Bennett's employment with BG (see *Potts & Co. v Lafayette Nat. Bank,* 269 NY 181, rearg den 269 NY 613; *Corrigan v Bobbs-Merrill Co.,* 228 NY 58, 69).

Additionally, Bennett's actual knowledge of and participation in JRI's misrepresentations, when considered in light of his relationship to BG, together with the unusual forbearance of BG in allowing JRI to retain BG's newly acquired crane for nearly a year without making the agreed rental payments, provides sufficient basis upon which to infer that as a matter of fact BG had actual knowledge of JRI's misrepresentations and acquiesced in them (see 21 NY Jur, Estoppel, §§ 35, 36, pp 48-53 and cases cited therein).

While it is acknowledged that a subcontractor's failure to pay a materialman in accordance with his contract, without more, imposes upon the materialman no duty to speak, the collusive nature of the manipulations here compels a different result. On this record, the conclusion is amply justified that BG must now suffer the consequence of Bennett's and its own unconscionable connivance. It failed to advise BSHC of JRI's fraudlent misrepresentations upon which BSHC relied, and must now be foreclosed from denying the truth of those representations (cf. *United States v Greene Elec. Serv. of Long Is.,* 379 F2d 207, 209; see, also, *United States v Monaco & Son,* 336 F2d 636).

In the view thus taken, there is no need to address other issues arising from the appeal and cross appeal. While there was some additional performance by BG on behalf of JRI subsequent to the date on which the last two false affidavits were filed by JRI with BSHC, the conclusion is inescapable that the additional labor and materials were supplied by BG with the intended purpose of requiring payment by the defendant and from no other source.

Accordingly, BG is estopped from invoking the provisions and protection of the payment bond since the bond was not intended to safeguard suppliers against the type of risk created here.

The judgment should be reversed and the complaint dismissed.

MARSH, P. J., CARDAMONE, HANCOCK, JR., and WITMER, JJ., concur.

Judgment unanimously reversed, on the law and facts, with costs, and complaint dismissed.