GENERAL CRUSHED STONE COMPANY, Appellant, *v.* STATE OF NEW YORK et al., Respondents. (Action No. 1.)

GENERAL CRUSHED STONE COMPANY, Appellant, *v.* STATE OF NEW YORK et al., Respondents. (Action No. 2.)

Third Department, May 28, 1965.

*McClung, Peters & Simon* (*Homer E. Peters* of counsel), for appellant.

*Mackenzie, Smith, Lewis, Michell & Hughes* (*John F. Lawton* of counsel), for Newark Insurance Company, respondent.

*Louis J. Lefkowitz, Attorney-General* (*Paxton Blair* of counsel), for State of New York, respondent.

*Charles H. McCarthy* for Central New York Contracting Co., Inc., respondent.

AULISI, J. The plaintiff, General Crushed Stone Company, hereinafter called "General", appeals from those parts of the judgments which dismissed its actions against the Newark

Insurance Company (Newark) for deficiency judgments on two labor and materials bonds.

The trial court in a comprehensive decision found that General, the materialman, improperly conspired with the Central New York Contracting Co., Inc. (Central), a contractor, to violate the trust fund provisions of section 70 of the Lien Law; that General also fraudulently concealed its knowledge that Central was in a precarious financial position so as to induce Newark to write the bonds in issue for Central and dismissed General's complaints in both actions. Sections 70 and 71 of the Lien Law in essence establish a trust fund of the moneys received by the contractor on any improvement of real property in New York State. The beneficiaries of this trust include the creditors of the contractor on that particular improvement (e.g., suppliers, laborers, etc., see *Aquilino* v. *United States of America* 10 N Y 2d 271). Therefore, any payment of moneys from a present job to a creditor of a previous job before payment is made to the creditors, suppliers, laborers, etc., of the present job would be a diversion of that trust fund (Lien Law, § 72; *American Blower Corp.* v. *James Talcott, Inc.,* 18 Misc 2d 1031, affd. 11 A D 2d 654, affd. 10 N Y 2d 282).

Newark is not a beneficiary of the Lien Law's trust fund for the amount here in dispute (see *Aquilino* v. *United States of America, supra*; *Chittenden Lbr. Co.* v. *Silberblatt & Lasker,* 288 N. Y. 396) and General is not the trustee that would be held liable for a violation in this case. Newark, nevertheless, contends and the trial court found that General's knowledge of the alleged violation by Central was such as to give it "unclean hands" so as to make it inequitable for General to recover on the surety. Newark urges that Central paid past debts out of present proceeds but we find no satisfactory proof to sustain this allegation. The evidence in the record does not establish what moneys were actually paid to General by Central, whether funds from present or prior jobs. Newark's expert witness used a somewhat arbitrary "first-in, first-out" accounting method which, though sufficient for other purposes, is hardly suitable as a means of tracing the funds from any particular job (see *Matter of Treister & Sons,* 145 F. Supp. 144; *Importers & Traders' Nat. Bank* v. *Peters,* 123 N. Y. 272, 278–279; *Idoni* v. *Down,* 170 Misc. 303). Furthermore, assuming that present proceeds were paid to General for past debts there would be no violation unless some beneficiary of the trust fund was prejudiced thereby. The record does not indicate that during the time this practice was employed there was any beneficiary other than General who remained unpaid. Admittedly General supplied

the materials on Central's Wayne County and Cayuga County jobs. It has not been paid. Therefore, we are unable to escape the conclusion that it should be paid by the surety that assured payment.

We perceive no basis for a finding of unclean hands. The relationship of General and Central was essentially that of creditor and debtor. They, therefore, were entirely within their rights to arrange a convenient method to settle their accounts (*McGraw & Co.* v. *Milcor Steel Co.,* 149 F. 2d 301, cert. den. 326 U. S. 753; *Bank of California* v. *Webb,* 94 N. Y. 467).

The other question before us is whether General fraudulently induced Newark to issue a surety bond to Central for the Wayne County and Cayuga County jobs. The only direct contact Newark had with General was a letter it sent to General, as it did to all other suppliers of Central, requesting information about Central. The letter, sent July 7, 1959, asked General to verify a balance of $116,986 which Central, in a financial statement it had supplied to Newark, stated that it owed General as of January 1, 1959. Newark also asked for " any other pertinent information ". On July 10, 1959, General replied that as of January 1, 1959, Central owed General $133,164.54 and that " the amount owed at the present time is considerably larger ". Actually, it was then $372,845.61. General's letter was neither fraudulent nor misleading. It was sufficient to put Newark on notice that Central might be deep in debt. However, Newark not only failed to request further information from General but did not make any inquiries of Central concerning the discrepancy or the greater debt revealed by General.

We are not impressed with Newark's claim that it was misled by its reliance upon General's letter. It had in its files detailed reports from Dun and Bradstreet on Central dating from January 1, 1959 to June 4, 1959; it had replies from other materialmen of Central, from subcontractors and other contractors; from banks and former underwriters of Central. We conclude that having undertaken this risk after an investigation of Central's financial status, which was insufficient only because of Newark's own limitation, it cannot now seize upon one letter, in itself not misleading, to avoid meeting its obligation.

In *Hartford Acc. & Ind. Co.* v. *Kranz* (7 A D 2d 604) the court stated (pp. 605–607): " We are satisfied that the record failed to disclose any fraudulent concealment. He who claims fraud must prove it and it was plaintiff's obligation to prove ' representation, falsity, *scienter,* deception and injury '. (*Ochs* v. *Woods,* 221 N. Y. 335, 338; *Reno* v. *Bull,* 226 N. Y. 546, 550.)

"In *Howe Mach. Co.* v. *Farrington* (82 N. Y. 121) the defendant gave a bond to the plaintiff company to indemnify Davis, one of its salesmen, for past and future indebtedness. The court said (p. 127) : ' The defendant had no communication with the company before signing it. The bond in terms referred to an existing indebtedness of Davis. The defendant made no inquiry of the company to ascertain the particulars, and the company made no representation. If the defendant deemed it material to be informed of the origin, nature or extent of the existing indebtedness, he should have inquired of the company before executing the bond. The company was under no duty to seek the defendant and make the disclosure. It was bound to act with good faith toward the defendant; but to hold the surety discharged by the omission to advise him of the particulars of the previous transactions with Davis, in the absence of any inquiry on the subject, would establish a rule which would make instruments of the character of the one in question of comparatively little value.'

"In *Western New Life Ins. Co.* v. *Clinton* (66 N. Y. 326) a bond was issued conditioned on the appointment of the principal Clinton, as agent of the plaintiff, to procure life insurance, collect premiums and pay to the plaintiff all money belonging to it. Two agreements had been executed between the parties. In one of them the plaintiff appointed Clinton as an agent to procure applications and insurance and to forward premiums and renewals to the plaintiff. By a second instrument, plaintiff allowed Clinton a commission upon moneys collected on behalf of the insurance agency. In an action to recover on the bond, defendant contended it only covered the first agreement. In denying this contention the court said (pp. 331–332) : ' Nor does it relieve the defendants from liability upon the bond, because the sureties had no knowledge of the second agreement until after the execution of the bond. Even if they were misled by the principal, at whose request the bond was executed, as to the character and extent of the obligation assumed, it is no valid defense to this action, unless it appears that the plaintiff was a party to the fraud practiced upon the defendants. (*Casoni* v. *Jerome*, 58 N. Y., 315, 321; *McWilliams* v. *Mason* 31 id., 294.) The position that the obligee in a bond is bound to seek out the sureties and explain to them the nature and extent of their obligation at the point of losing the security, or that he is to be held responsible for the fraudulent representations or concealment of the principal of any of the facts, is somewhat novel, and is not upheld by any adjudged case. It is the duty of the sureties to look out for themselves and ascertain the nature of the obliga-

tion embraced in the undertaking, and any other rule would not only work serious inconvenience, but render securities of this character of but little, if of any, value.'

" In *Larmore* v. *Peoples State Bank* (206 Ind. 66, 75) the court said: ' It is well settled that one who is asked to become a surety must exercise reasonable diligence to know the circumstances of the transaction, and the condition of his principal, and *if he is put upon his guard by circumstances surrounding the transaction, and can upon reasonable inquiry ascertain all of the facts necessary to shield himself from loss, he is bound to make the inquiry.* He must not suffer himself to become an indolent victim of fraud.' (Emphasis supplied.) "

The judgments should be modified, on the laws and the facts, so as to award deficiency judgments in favor of the appellant against respondent Newark Insurance Company for $137,748.27, with appropriate interest and costs, and, as so modified, affirmed, with costs to appellant.

GIBSON, P. J., and TAYLOR, J. (dissenting). The lucid opinion of Mr. Justice SCHIRICK at Trial Term (46 Misc 2d 266) seems to us to present an accurate analysis of the issues and to reach the correct conclusions and determination; and we write only in outline and merely to place somewhat greater emphasis on the element of fraudulent concealment, which seems to us to have been well established.

It is clear that General and Central evolved what must have initially appeared to have been a mutually advantageous arrangement whereby General sold its product to Central at preferential prices, thereby improving Central's competitive bidding position, as General, in turn, gradually displacing its competitor, became Central's principal supplier. Central's financial condition deteriorated, for reasons which do not appear, and although, as the trial court was warranted in finding, its losses steadily mounted and its insolvency was an established fact and one well known to General and, indeed, a subject of discussion between the two companies, General nevertheless continued to supply materials upon credit. The series of year-end balances due is significant: 1952 — $0.00; 1953 — $0.00; 1954 — $179.35; 1955 — $83,984.40; 1956 — $118,320.60; 1957 — $160,787.51; 1958 — $199,716.21; 1959 — $402,175.73. The contracts with which this litigation is concerned were performed in 1959. In that year, Central's purchases from General rose to $697,000. On July 10, 1959 — the date of the critical letter — the balance due was $372,845. There is abundant evidence that Central's financial operations were controlled by General,

through the close supervision of its representative, Van Cleve, who directed the application of Central's receipts, and by the dominance of General's officers in Central's affairs generally. The trial court correctly found it "evident that Central's continued operations were dependent entirely upon General's indulgence and financial support." The basis of General's agreement to continue shipments, despite Central's acknowledgment of its insolvency, was the condition imposed by General that no account due it should be permitted to extend beyond the lien date. Thus, the trial court found, "General sought to assure payment by the surety if Central could no longer pay old bills with new moneys." The court's opinion continued: "The inevitable occurred in December, 1959 when General filed a lien on the Wayne County job. The following March 31st it filed a lien on the Cayuga County job. The result was to put Central out of business."

The record is scarcely susceptible of any inference other than the conclusion that when the surety company's inquiry for credit verification and "any other pertinent information that might be advantageous in our efforts to underwrite three fifty per cent performance and payment bonds", was received, General was, in all things fiscal, Central's alter ego; and Central, having surrendered control of its financial operations, enjoyed a status little different from that of a subsidiary affiliate. Quite aside from all the other evidence, General's representative, the watchdog Van Cleve, virtually admitted, or so it could be found, that funds from current contracts were being used to pay for materials supplied by General to earlier jobs. Thus there becomes significant, and apparently a matter of affirmative misrepresentation, the statement in General's letter of July 10, 1959: "We are informed that the balance will be paid shortly as the State of New York is about to make payment of *estimate covering this material.*" (Emphasis supplied.) Upon the entire record it is apparent that at the time of respondent surety company's inquiry, as theretofore, General's interest in Central's obtaining adequate bonding was a vital one.

"The contract of suretyship imports entire good faith and confidence between the parties in regard to the whole transaction * * * [and] the slightest fraud on the part of the creditor, touching the contract, annuls it" (50 Am. Jur., Suretyship, § 163, p. 1011) and "where the obligee is applied to by the proposed surety for information, and he assumes to answer the inquiry at all, or where the obligee volunteers information to the surety, it is his duty *fully to disclose* to the surety relevant

information in his possession as to the material facts bearing on the risk '' (*op. cit.*, § 166, pp. 1013–1014; emphasis supplied). The principles stated are supported by respectable authority. (See *Phillips* v. *United States Fid. & Guar. Co.*, 200 App. Div. 208, affd. *sub nom. Stoddard* v. *United States Fid. & Guar. Co.*, 234 N. Y. 618, mot. for rearg. den. 236 N. Y. 555; *Stoddard* v. *Maryland Cas. Co.*, 234 N. Y. 619, mot. for rearg. den 236 N. Y. 555 [arising out of the collapse of the same bank]; *Matter of First Citizens Bank & Trust Co. of Utica* v. *Sherman*, 250 App. Div. 339; *Copper Process Co.* v. *Chicago Bonding & Ins. Co.*, 262 F. 66.)

The proof of General's direction of, and participation in Central's diversions of payments (Lien Law, § 25-a, now § 70) is effective, although not indispensable, as establishing General's motivation in writing the surety company as it did and as lending support to the inferences reasonably to be drawn from the other circumstances preceding and surrounding General's letter. The trial court also found in this proof an additional basis for its determination, holding: '' The evidence establishes that General aided and abetted Central in the violation of the trust provisions of the Lien Law. Its conduct enabled it to secure payment of old debts; it also enabled Central to incur the obligations here in suit. Under equitable principles General should not be permitted to profit from its own misdeeds (*Grace* v. *Corn Exch. Bank Trust Co.*, 287 N. Y. 94 [1941]).'' We agree with these conclusions; and consider that the felonious larceny which would be constituted by the diversion (Penal Law, § 1302-c) is not to be as lightly passed over as the majority opinion would have us do; and the fact, if it is such, that the original victims were subsequently paid seems no reason to permit a co-conspirator to recover at the expense of the surety. In any event, the judgment is, in our view, fully sustainable on either of the grounds discussed. Consequently, we vote to affirm.

HERLIHY and REYNOLDS, JJ., concur with AULISI, J.; GIBSON, P. J., and TAYLOR, J., dissent and vote to affirm in an opinion.

Judgments modified, on the law and the facts, so as to award deficiency judgments in favor of the appellant against respondent Newark Insurance Company for $137,748.27, with appropriate interest and costs, and, as so modified, affirmed, with costs to appellant.