RACHMAN BAG COMPANY, a Partnership Composed of Plains Bag and Bagging Co., Inc., and Rachman Bag Co., Inc., Plaintiff,

v.

LIBERTY MUTUAL INSURANCE COMPANY, Defendant.

No. 90 CV 2412 (ERK).

United States District Court, E.D. New York.

Dec. 15, 1993.

Neal Factor, Factor & Shweky, New York City, for plaintiff.

Kimberly S. Penner, Sedgwick, Detert, Moran & Arnold, New York City, for defendant.

## MEMORANDUM AND ORDER

KORMAN, District Judge.

Plaintiff Rachman Bag Co. ("Rachman") brought this action against Liberty Mutual Insurance Co. ("Liberty") seeking to enforce a surety bond issued by Liberty which names plaintiff as obligee. Both sides have moved for summary judgment. The issue presented by this case is when, if at all, an obligee of a suretyship contract must disclose to its surety facts known to the obligee which materially affect the nature of the risk undertaken by the surety.

At the heart of this dispute is a surety bond in the amount of $350,000 issued by Liberty on December 9, 1988, naming Textiles of America, Inc. ("TOA") as principal and Rachman as obligee. When first issued, the bond purported to secure TOA's performance under a December 9, 1988 "written agreement" with Rachman "for Delivery of Institutional Textiles." *See* Ex. B to Affidavit of Kimberly S. Penner, June 17, 1993 ("Penner Aff."). Although the bond provided that the secured agreement could be attached thereto for reference, no such agreement was attached when the bond was first issued in December 1988. *Id.*

The reason for this omission was that there was no written agreement between Rachman and TOA at that time. Rather, according to Rachman, in December 1988 the parties had reached merely an oral agreement. It was not until January 12, 1989 that the parties signed a written contract ("January 12 Contract"). Rachman contends that this contract memorialized the earlier oral agreement.

The January 12 Contract between TOA and Rachman was styled both as repayment of a prior $350,000 indebtedness owed by TOA to Rachman and as a vendor-vendee sales agreement. *See* Ex. D to Penner Aff. Under the terms of the agreement, TOA was responsible for paying to Rachman $10,000 per month for the first two years of the contract and almost $13,000 per month for the third year. TOA, at its own option, could satisfy the amount due each month in one or more of three possible ways: i) by direct shipment to Rachman of institutional textiles; ii) by cash payment; or iii) by procuring new business for Rachman. With respect to the third method of payment, the contract envisioned TOA soliciting orders for institutional textiles from its own customers, which would be filled by Rachman. The profits Rachman realized from these sales would then be applied toward reducing TOA's indebtedness.

The source of TOA's indebtedness stemmed not from monies advanced willingly by Rachman, but rather from the thievery of TOA president Ronald Halpern. The undisputed facts show that TOA and Rachman had done business together for over one year prior to issuance of the bond. During that time, TOA had accumulated a debt to Rachman of almost $400,000, as a result of several unscrupulous practices, including: i) writing checks to Rachman from accounts with insufficient funds; ii) receiving and retaining payments, owed to Rachman, from third party customers; and iii) wrongfully receiving and retaining rejected orders of textiles, shipped to customers originally by Rachman. In addition, TOA had already defaulted on a similar agreement it had made with Rachman dated January 15, 1988.

Sometime after the execution of the January 12 Contract, Rachman's counsel, Neal Factor, contacted Liberty to inquire whether Liberty had in fact issued a bond covering TOA's performance with Rachman. It was evidently Factor's intention to make sure that the bond which Liberty had issued on December 9, 1988 actually did ensure the contract of January 12, 1989 between TOA and Rachman. To that end, in February 1989 both Factor and Ronald Halpern, president of TOA, prevailed upon one Adrian Marshall, a sales representative at Liberty, to append a copy of the January 12 Contract to the back of the bond in Liberty's possession. Subsequently, Factor further persuaded Marshall to alter the face of the bond so that it purported to secure a "Contract between Rachman Bag Company and Textiles of America, Inc. dated January 12, 1989." *See* Ex. C to Penner Aff.

Although Marshall had obtained the approval of Liberty underwriter William Chess to affix the contract to the bond, *see* Deposition of Adrian Marshall at 58, Marshall did

not have actual authority to alter the face of the bond. Nonetheless, after he altered the bond, Marshall's supervisors at Liberty were informed of what he had done, and they took no steps to repudiate the bond.

On February 15, 1989, Rachman and TOA signed another agreement ("February 15 Contract"), intending to supplement the January 12 Contract. Under this latest agreement, Rachman advanced TOA an additional $20,000, which was to be repaid at the rate of $1000 per week, in the same fashion as the earlier advances—by textiles, cash, and/or profits from new sales contracts. *See* Ex. D to Affidavit of Neal Factor, July 17, 1991.

On March 1, 1989, TOA defaulted under the January 12 contract, and one month later Rachman reported this fact to Liberty, demanding payment on the bond. When Liberty refused, Rachman commenced this action in the United States District Court for the Northern District of Texas. The case was transferred to the Eastern District of New York, *see Rachman Bag Co. v. Liberty Mutual Ins. Co.*, No. CA5–89–0237–W, slip op. (N.D.Texas June 26, 1990) (Order), and plaintiff then moved for summary judgment. I denied plaintiff's motion without prejudice and with leave to renew after discovery.

In a Memorandum and Order dated July 10, 1991, which was entered prior to the pretrial discovery that Liberty had ratified the alteration of the bond by Marshall, I identified the central issue in this case as whether plaintiff knew that it was Adrian Marshall who altered the bond:

> [T]he bond itself contains a power of attorney expressly authorizing Mary Catherine Walters to execute it on behalf of Liberty Mutual. If plaintiff knew that Mr. Marshall made the alteration, then it was incumbent on plaintiff to make further inquiry as to Mr. Marshall's authority to make the alteration. If such an inquiry was not made, plaintiff may succeed here only if it can demonstrate that Liberty Mutual had cloaked Mr. Marshall with the apparent authority to make the alteration.... On the other hand, if plaintiff did not know that Mr. Marshall made the alteration, and

assumed in good faith that it had been made by Mary Catherine Walters, then plaintiff may be entitled to prevail.

*Rachman Bag Co. v. Liberty Mutual Ins. Co.*, No. CV–90–2412 (ERK), slip op. at 2 (E.D.N.Y. July 10, 1991) (Memorandum & Order).

After completion of extensive discovery, plaintiff renewed its motion for summary judgment. This motion was referred to United States Magistrate Judge Joan M. Azrack for a report and recommendation. In her report, the Magistrate identified what she believed to be several issues of material fact and recommended that Rachman's motion be denied. *See* Report and Recommendation of the Honorable Joan M. Azrack, February 16, 1993 ("Report").

On June 3, 1993, argument was heard from both parties in response to the Report. At that time, it became clear that the issue identified in my July 10, 1991 Order, regarding the authority of Liberty's agent to alter the bond, was no longer critical to the case. *See* Transcript of Argument of June 3, 1993 ("Transcript") at 12–13. That is, regardless of whether Marshall had apparent authority to make the alteration of the bond, his superiors at Liberty learned of his actions almost immediately thereafter. So informed, these individuals nonetheless did not question Liberty's exposure on the bond, did not seek clarification from the obligee as to the nature of the underlying contract, and most importantly did not seek to repudiate the bond. *See* Transcript at 13–15 (citing 2 N.Y.Jur.2d *Agency* § 165 (1987) ("a principal, having once ratified his agent's acts cannot afterward avoid the effect of such ratification by showing that he was not acquainted with all of the facts of the transaction ratified, where he was always in the position to learn them")); *see also Skyline Agency v. Ambrose Coppotelli, Inc.*, 117 A.D.2d 135, 148, 502 N.Y.S.2d 479, 489 (2d Dep't 1986) (principal was bound to third person by acts of agent when the principal had "confirmed unauthorized acts either expressly or impliedly by words or conduct").[1]

---

1. The surety bond was obtained by TOA, which has its principal place of business in Pittsburgh, Pennsylvania. Liberty, which issued the bond, has its principal place of business in Massachu-

I therefore rejected Liberty's defense on this ground at the argument on June 3, 1993, and declined to adopt the recommendation of the Magistrate in this and other respects. Instead, plaintiff's motion for summary judgment was granted as to all issues except for one: whether the February 15 Contract materially altered the January 12 Contract. *Rachman Bag Co. v. Liberty Mutual Ins. Co.*, No. CV–90–2412 (ERK) (E.D.N.Y. June 4, 1993) (Order). In my Order of June 4, I also granted Liberty permission to submit its request for leave to amend its first Amended Answer to include the affirmative defense of fraudulent concealment. Accordingly, Liberty has moved, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, for leave of the court to amend its Amended Answer and it has also cross-moved for summary judgment on this defense. Before reaching the merits of the parties' respective summary judgment motions, I address plaintiff's objections to Liberty's motion to amend.

Rule 15(a), Fed.R.Civ.P., provides that a party may amend its pleading "by leave of the court . . .; and leave shall be freely given when justice so requires." The Supreme Court has held that the mandate of Rule 15(a) "is to be heeded" so that parties have a full opportunity to test their claims on the merits. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Although the Supreme Court identified "undue delay" as proper grounds upon which to deny a motion to amend, *see id.*, the Court of Appeals has held that "[m]ere delay . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir.1981); *see also United States v. Continental Illinois Nat. Bank and Trust*, 889 F.2d 1248, 1254 (2d Cir.1989).

It is now over four years since plaintiff first filed its complaint. While I am not entirely persuaded that Liberty's delay in asserting this defense was necessary, plaintiff has been on notice for some time that Liberty was contemplating the defense of fraud. Indeed, Liberty included this defense in its original answer. The defense was later withdrawn without prejudice, pending the discovery necessary to meet the particular pleading requirements of Rule 9(b), Fed. R.Civ.P. *See Rachman Bag Co. v. Liberty Mutual Ins. Co.*, No. CV–90–2412 (ERK), slip op. at 2 (E.D.N.Y. July 10, 1991) (Memorandum & Order). Under these circumstances, and in view of the liberal mandate of Rule 15(a), Liberty's motion to amend its amended answer is granted.

I now turn to the merits of the parties' respective summary judgment motions.

## DISCUSSION

In support of its motion for summary judgment, plaintiff Rachman submits Contract Bond QC1–581–042133–068, dated December 9, 1988. The bond was issued by defendant Liberty naming TOA as principal, Rachman as obligee, and securing a "Contract between Rachman Bag Company and Textiles of America, Inc. dated January 12, 1989." Plaintiff has also submitted the January 12 Contract, wherein TOA agrees to specific terms for the repayment of a $350,000 indebtedness owed to Rachman. Finally, plaintiff asserts that TOA violated the terms of this contract, and that plaintiff has made a demand for payment from defendant surety, pursuant to the terms of the bond.

Liberty raised four principal defenses to plaintiff's cause of action: 1) that the agreement underlying the bond was materially altered without Liberty's consent by the February 15 Contract; 2) that the bond itself was altered by persons unauthorized to do so; 3) that Rachman failed to supply consideration for TOA's promise to perform; and 4) that Rachman fraudulently concealed material information from Liberty. *See* Amended Answer at 4–6. At oral argument on June 3,

---

setts. Plaintiff, for the benefit of which the bond was issued, transacts business in Brooklyn, New York. While it is not clear that New York law is applicable here, both parties have relied upon New York law in their briefs and have declined to raise the choice of law issue. Under these circumstances, it is assumed that New York law governs. *See Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir.1984) ("in the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied").

1993, I rejected both the unauthorized alteration, *see* discussion *supra,* and the failure of consideration defenses. Because I now conclude that Liberty is entitled to summary judgment on its defense of fraudulent concealment, there is no need to address Liberty's defense that the agreement underlying the bond was substantively altered without Liberty's consent by the February 15 Contract.

Liberty asserts that the risk it undertook in ensuring TOA's performance was an extraordinary one, that went "far beyond a normal business situation." Memorandum of Law in Support of Defendant's Motion for Leave to Amend its Amended Answer and for Summary Judgment Against Plaintiff ("Defendant's Mem.") at 4. As support for this proposition, Liberty asserts that Ronald Halpern, in applying for the bond, never disclosed to Liberty the record of his deceitful practices during the course of TOA's relationship with Rachman.[2] *Id.* at 3; Defendant's Submission of December 8, 1993. Liberty also argues that Rachman breached its obligation to inform Liberty of these extraordinary facts before Liberty became liable on the bond, despite an opportunity to do so and the knowledge that Liberty was unaware of this information. Defendant's Mem. at 3. Had Liberty been so informed, it assures through the affidavits of its underwriters, *see* Affidavit of Anthony Messore and Affidavit of William Chess, it would not have issued the bond.

Plaintiff does not contend that either Halpern or anyone at Rachman ever informed Liberty of the nature and extent of Rachman's strained history with Halpern. *See* Plaintiff's Submission of December 7, 1993. Rachman's argument, however, is that because "the bond was irrevocably issued on December 9, 1988 without [Rachman's] knowledge," the surety could not have *relied* on Rachman's omission. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Leave to Amend its Amended Answer and for Summary Judgment Against Plaintiff ("Plaintiff's Opp.

Mem.") at 10. Had it been consulted, Rachman maintains, it would have readily complied with any requests for information from Liberty. *Id.* at 8.

■ Fraudulent concealment on the part of an obligee/creditor is recognized in New York as an affirmative defense to the enforcement of a suretyship contract. The case for fraud is strongest where it is the creditor that has induced the surety to assume the obligation in the first place; for example, the employer who seeks to have its employee bonded. *See Bostwick v. Van Voorhis,* 91 N.Y. 353, 360 (1883) ("undoubtedly true" that employer/obligee with knowledge that its employee "had been dishonest and unfaithful in his office" was bound to apprise the sureties of that fact). Even where a principal who is not an agent of the obligee procures the surety, it remains the obligee's duty to act at all times in good faith towards the surety, and not to mislead the surety by misrepresentations or omissions. *First Citizens Bank & Trust Co. v. Sherman's Estate,* 250 A.D. 339, 345, 294 N.Y.S. 131, 139 (4th Dep't 1937).

In most cases where a New York court has avoided a suretyship contract, there has been misrepresentation or active fraud on the part of the obligee, thereby forfeiting its right of recovery under the contract. *See General Crushed Stone Co. v. State,* 19 N.Y.2d 737, 279 N.Y.S.2d 190, 225 N.E.2d 893 (1967) (obligee took part in conspiracy by aiding principal to evade trust provisions of lien law); *Sherman's Estate,* 250 A.D. 339, 294 N.Y.S. 131 (obligee knowingly mislead surety regarding the existence of collateral); *see also Chemical Bank v. Layne,* 423 F.Supp. 869 (S.D.N.Y.1976) (obligee knowingly misrepresented the value of collateral to surety).

■ The more difficult case arises where the prospective surety has not even inquired of the obligee. In such a case, the obligee is generally not required to go out of its way to pursue the surety and disclose to it all of the facts known to the obligee which bear upon

2. These included: i) writing checks to Rachman from accounts with insufficient funds; ii) receiving and retaining payments, owed to Rachman, from third party customers; and iii) wrongfully receiving and retaining rejected orders of textiles, shipped to customers originally by Rachman.

the contemplated undertaking. Rather, "[i]t is the duty of the sureties to look out for themselves and ascertain the nature of the obligation." *Western N.Y. Life Ins. Co. v. Clinton*, 66 N.Y. 326, 331 (1876). *See Howe Machine Co. v. Farrington*, 82 N.Y. 121 (1880) (obligee not bound to disclose to surety fact of principal's prior default in the absence of inquiry by surety); *State Bank of Albany v. McDonnell*, 40 A.D.2d 905, 337 N.Y.S.2d 697 (3rd Dep't 1972) (same).

These cases reflect the pragmatic understanding that the utility of a performance bond issued for the benefit of a third party would be seriously undermined if the surety could assert the fraud of the principal in an action by a third party, who is unaware of the principal's fraud. *See Bostwick*, 91 N.Y. at 361. There are no reasons of policy, however, to deny the surety's defense to an action by a third party beneficiary who knew or should have known that the surety was being defrauded. Accordingly, the Court of Appeals has held that "[t]here may be circumstances *known* to a party taking a guaranty for the conduct of another, of so decisive a character that ... [the party] cannot withhold the information and enforce the obligation." *Howe*, 82 N.Y. at 125 (emphasis added).

While there are very few cases in which a New York court has sustained a defense by a surety based on fraudulent concealment by the obligee, two particular cases are instructive. In *United States Life Ins. Co. v. Salmon*, 36 N.Y.S. 830 (Gen.Term, 1st Dep't 1895), *affirmed*, 157 N.Y. 682, 51 N.E. 1094, plaintiff obligee sought a surety bond for two of its own employees, who had previously embezzled a large sum of money from plaintiff. Plaintiff knew of its employees' past defalcations and yet neglected to inform the prospective sureties despite "plenty of opportunity to communicate" this information to them before the sureties signed the bond. *Id.* at 832. Under these circumstances, it was held that it was "not good faith" for the obligee to withhold such information, and the obligation of the surety was therefore relieved.

*Damon v. Empire State Surety Co.*, 161 A.D. 875, 146 N.Y.S. 996 (2d Dep't 1914) is a case strikingly similar to the case at bar. In *Damon*, the underlying contract bonded by the surety was the restructuring of a prior debt owed by the principal to the obligee. The obligee in *Damon* had had no "direct dealings" with the surety prior to the date that the principal procured the bond. 161 A.D. at 876, 146 N.Y.S. at 997. Moreover, the principal was not the agent of the obligee. *Id.* Nonetheless, the surety was permitted to defend on the ground that "[t]here was no expression in [the contract underlying the bond] to indicate that it was but a renewal agreement of a contract previously made *and as to which there had been a default in performance by the [principal]*." 161 A.D. at 877, 146 N.Y.S. at 998 (emphasis added). The Appellate Division held that because of this nondisclosure, the written contract upon which the surety agreement was based was itself a "manipulation" and essentially a fraud, committed in part by the obligee. *Id.* Because the obligee had concealed the circumstances of its relationship with the principal, it could not enforce the surety's obligation on the bond.

■ While Liberty failed to make the kind of inquiry of Rachman that arguably would have lead to the disclosure of the material facts at issue, the circumstances of this case satisfy the elements of a successful fraudulent concealment defense: i) facts known to the obligee that materially increase the risk to the surety, beyond that which the obligee has reason to believe the surety intends to assume; ii) knowledge by the obligee that such facts are unknown to the surety; and iii) opportunity on the part of the obligee to communicate the relevant information to the surety. *See* Proposed Restatement of the Law of Suretyship, § 9(3) (Tentative Draft No. 2, June 1992); Restatement of Security, § 124(1) (1941) (cited in *First Nat. Bank & Trust Co. v. Notte*, 97 Wis.2d 207, 293 N.W.2d 530, 535 (1980)); 63 N.Y.Jur.2d *Guaranty and Suretyship* § 177.

The information possessed by Rachman regarding Ronald Halpern and TOA was so extraordinary, that Rachman was obligated to disclose it to Liberty, even in the absence of a request, if it had the opportunity to do so. Simply stated, Rachman possessed infor-

mation that indicated it was very likely that TOA would default on the agreement with Liberty. By its own admission, Rachman did not trust Ronald Halpern, not only because he had previously defaulted on his debts, but because Halpern had actually *stolen* from Rachman. Rachman had both proof and an admission from Halpern that TOA had misappropriated funds that were concededly owed to Rachman. *See* Deposition of Laurence Gewirtz (of Rachman) at 45. Moreover, many of Halpern's defalcations had occurred in violation of a contract similar to the very agreement Rachman sought to have bonded by Liberty. Rachman's own counsel, in reporting Halpern to the United States Postal Inspectors, had referred to Halpern's conduct as "an intentional and systematic effort to defraud" Rachman. *See* Ex. S to Penner Aff. (Correspondence of Neal Factor).

The uncontested evidence also indicates that Halpern never disclosed to Liberty the misconduct he had engaged in with Rachman that lead to the antecedent debt that was the subject of the bond. Nor could Rachman possibly have assumed that Halpern would have made such an admission and still obtained the bond. Indeed, the testimony of Rachman's lawyer, Neal Factor, establishes that Rachman was well aware that Liberty was not informed as to the details of the relationship between TOA and Rachman. Factor testified to having several phone conversations with individuals at Liberty during late December 1988 and the months of January and February 1989. *See* Deposition of Neal Factor ("Factor Deposition") at 231–39. During the course of these conversations, by Factor's own account, the people with whom he spoke at Liberty were unaware that the purpose of the contract between TOA and Rachman was to repay an antecedent debt— let alone that this debt had arisen after Halpern had stolen from Rachman and thereby defaulted on a contract nearly identical to the one Liberty was asked to ensure. Because such information was not a matter of public record, and because it was safe for Rachman to assume that Halpern would not have disclosed his indiscretions to Liberty, it must have been clear to Rachman that Liberty was unaware of this material information.

■ Finally, it is clear that Rachman, through its lawyer, had ample opportunity to apprise Liberty of material information before the surety became liable on the bond. Contrary to Rachman's argument that Liberty became "irrevocably" liable on December 9, 1988, *see* Plaintiff's Opp.Mem. at 10, Liberty was not liable on the bond, as originally issued, because it purported to secure a "written agreement" that simply did not exist. Both parties acknowledge that there was never a written agreement of December 9, 1988. More significantly, even if there is sufficient evidence to raise an issue of fact as to whether the January 12 Contract simply memorialized an oral agreement made December 9, and even if Liberty would otherwise be liable on the bond notwithstanding the fact that a "written agreement" of December 9 never existed, under the circumstances here, it is clear that Liberty was not immediately liable on the surety bond after it was first issued on December 9, 1988. Before a surety will incur an obligation on a bond, the instrument must be delivered to and accepted by the obligee. *See People v. Bostwick,* 32 N.Y. 445, 447 (1865) (delivery); *Agawam Bank v. Strever,* 18 N.Y. 502, 506–07 (1859) (delivery); *Davis Sewing Machine Co. v. Richards,* 115 U.S. 524, 6 S.Ct. 173, 29 L.Ed. 480 (1885) (acceptance); *Hauswald v. Katz,* 216 A.D. 92, 97, 214 N.Y.S. 705, 710 (1st Dep't 1926) (acceptance); 63 N.Y.Jur.2d *Guaranty and Suretyship* §§ 60–63. The evidence in this case demonstrates that the bond was not delivered to, nor accepted by Rachman until several months after it was first issued by Liberty.

■ Rachman's lawyer has testified that, in January 1989, when he first received an "example" copy of the bond marked for "exhibit purposes only," he had two concerns. Factor Deposition at 202. First, he was unsure whether a bond could be written to cover the kind of transaction, involving antecedent debt, that Rachman contemplated with TOA. *Id.* Secondly, he was concerned about the discrepancy between the December 9 Contract, mentioned on the bond, and the January 12 Contract that was in fact the agreement reached between the parties. *Id.*

at 203. Factor explained that he then conducted research for the purpose of answering his own question: "How can I make sure that this bond would cover this particular contract ...?" *Id.* The fruits of his research ultimately lead Factor to persuade Adrian Marshall, at Liberty, to affix a copy of the January 12 Contract to the back of the bond and to alter the face of the bond so that it referred expressly to the January 12 Contract.

Rachman was not only reluctant, if not unwilling, to accept the bond that Liberty proposed to tender originally, but Rachman's lawyer unequivocally admitted that Rachman did not begin to transact business pursuant to the January 12 contract, until it received the altered bond in February, 1989. Specifically, Factor testified that "Rachman was waiting until they had the [altered] bond in their possession before they would begin the transaction pursuant to the contract." Factor Deposition at 245. He then confirmed that the bond was delivered "in early February" of 1989. *Id.* Thus, by its own admission Rachman did not accept the bond or act in reliance on it, until February 1989, after it had been delivered with the modification made to reflect the January 12 contract.

It is undisputed that Factor had several conversations with individuals at Liberty prior to February 1989. Although he maintains that he took great pains to explain that the contract between Rachman and TOA was for the repayment of an antecedent debt, *see* Factor Deposition at 234–35, 239, Factor *never* mentioned to anyone at Liberty that the debt itself was the result of, in Factor's own words, a "systematic effort to defraud Rachman." Ex. S to Penner Aff. (Correspondence of Neal Factor). On the contrary, Factor's admitted purpose during the course of these many telephone conversations was to make sure that individuals at Liberty altered the face of the bond so that it would refer to the January 12 Contract. *See* Factor Deposition at 204–05, 238. Because these conversations, which resulted in the issuance of a bond that was drafted to conform to Rachman's own specifications, took place before the acceptance of the bond, Rachman had ample opportunity to comply with its obligation to communicate material information to Liberty before the latter became liable on the bond.

Nor should Liberty's negligence preclude it from asserting the defense of fraudulent concealment. While it is true that "[o]ne who by a negligent mistake executes a mortgage or a suretyship undertaking can not have it set aside after an *innocent* party has made a loan in reliance upon it," *see* 3A *Corbin on Contracts* § 606 (1960) (emphasis added), Rachman cannot claim the mantle of innocence in this case. Although Rachman did not participate actively in defrauding Liberty, Rachman had both good reason to believe that the surety was being deceived and ample opportunity to so inform Liberty before Rachman accepted the bond and acted in reliance upon it. Under these circumstances, Rachman may not enforce the bond against Liberty. *See* 63 N.Y.Jur.2d *Guaranty and Suretyship* § 180 (1987) ("The surety's carelessness or failure to seek additional information regarding the risk does not deprive the surety of an affirmative defense of fraud where the creditor had a duty to disclose fully all relevant information bearing on the risk.")

## CONCLUSION

Over a century ago, Justice Haight observed:

[I]t is not clear, or always easy to determine, just what facts or circumstances make a case in which it is the duty of a person taking security from another to make known to the proposed surety the facts of the case, and thus warn him of his danger. But it appears to us that where a person taking security knows the facts, and is personally present, having an opportunity to inform the proposed surety, and having reason to believe that the proposed surety does not know the facts, and is being deceived and defrauded into becoming such, it is his duty to post him, and the acceptance of him as surety or indorser, under such circumstances, would be a fraud which would avoid the contract.

*Farmers' Nat. Bank of Franklinville v. Van Slyke,* 1 N.Y.S. 508, 510 (Sup.Ct., Gen.Term., 5th Dep't 1888). This is such a case. Ac-

cordingly, defendant's motion for summary judgment in its favor is granted, and plaintiff's motion is denied.

SO ORDERED.