RACHMAN BAG COMPANY, a partnership composed of Plains Bag and Bagging Co., Inc., and Rachman Bag Co., Inc., Plaintiff–Appellant,

v.

LIBERTY MUTUAL INSURANCE COMPANY, Defendant–Appellee.

No. 214, Docket 94–7115.

United States Court of Appeals, Second Circuit.

Argued Sept. 8, 1994.*

Decided Feb. 1, 1995.

* Due to illness of appellant's counsel, the case was submitted by plaintiff-appellant.

232

Neal Factor, Factor & Shweky, New York City, for plaintiff-appellant.

Kimberly S. Penner, Sedgwick, Detert, Moran, & Arnold, New York City (David J. Daly, Lecomte, Emanuelson, Tick, & Doyle, Boston, MA, on the brief), for defendant-appellee.

Before: MESKILL, MAHONEY, and WALKER, Circuit Judges.

WALKER, Circuit Judge:

This action is brought by Rachman Bag Company ("Rachman"), an obligee on a surety bond, against the surety Liberty Mutual Insurance Company ("Liberty") for payment of the bond. Plaintiff appeals a judgment of the United States District Court for the Eastern District of New York (Edward R. Korman, *Judge*) granting defendant summary judgment on its defense of fraudulent concealment and denying plaintiff summary judgment on its claim. Rachman contends that the district court abused its discretion in allowing Liberty to amend its amended answer to include the defense and that there are genuine issues of material fact as to

whether Rachman engaged in fraudulent concealment.

For the reasons explained below, we reverse the order of the district court and remand.

## BACKGROUND

On December 9, 1988, Textiles of America ("TOA") obtained a bond from defendant Liberty naming Rachman as obligee and Liberty as surety. The bond purported to secure a normal business transaction between TOA and Rachman. Unbeknownst to Liberty, however, the bond actually secured an arrangement whereby TOA would repay through services over $400,000 stolen from Rachman by TOA's president, Ronald Halpern. Liberty's refusal to honor the bond after learning of the true nature of the underlying transaction led to this suit.

Rachman and TOA began doing business in 1987. During that year, TOA both purchased textiles from Rachman and solicited orders from others to be filled by Rachman. Within a few months, Rachman's attorney and partners learned that Halpern had used a variety of shady practices to pilfer money and goods from Rachman. In particular, Halpern paid Rachman with bad checks, retained payments destined for Rachman from customers, and kept goods rejected by Rachman customers who were repaid by Rachman.

Rachman confronted TOA with its discovery in late 1987 and served Halpern with a civil complaint. After intensive negotiations, the two parties reached an agreement under which Rachman would refrain from prosecuting the complaint and Halpern would repay his debt by obtaining business for Rachman. A few months later, however, Rachman learned that Halpern had continued his unseemly practices and had defaulted on the agreement. As a result, TOA's obligation to Rachman stemming from Halpern's thievery had risen to over $400,000. Upon learning this information, Rachman ceased its dealings with Halpern and TOA.

Halpern approached Rachman to make amends in November, 1988. After acknowledging his wrongdoing, Halpern proposed another arrangement under which he would solicit orders for Rachman's textiles and return a portion of TOA's profit as repayment for the thefts. As part of the deal, Halpern requested an additional loan from Rachman. When Rachman's partners expressed reluctance, Halpern offered to obtain a surety bond to secure his performance. The two parties reached an oral agreement on December 9, 1988; the same day, Halpern obtained a $350,000 bond from Liberty as security.

When obtaining the bond from Liberty, Halpern did not explain the true nature of the arrangement between TOA and Rachman. Halpern told Liberty representatives only that the bond was needed to secure a contract for delivery of textiles. He did not explain that the contract was for the repayment of an antecedent debt, much less that the obligation arose from Halpern's admittedly wrongful conduct. He also did not disclose that he had defaulted on a nearly identical prior agreement. Halpern told Liberty that the bond was to secure a "written agreement ... for Delivery of Institutional Textiles" at a time when Rachman and TOA had yet to put the arrangement in writing. Liberty had previously provided bonds to TOA and, taking Halpern at his word, conducted essentially no investigation beyond interviewing Halpern before issuing the bond to TOA on December 9.

While the foregoing facts are not in dispute, the same cannot be said of the subsequent communications between Rachman and Liberty. Glendora Harris, a Liberty representative, testified that she called Rachman in late December, 1988 to inquire about the status of the transaction and was referred to Rachman's attorney, Neal Factor. She recounted that Factor asked whether Liberty had a copy of the contract and then mentioned a loan. Harris testified that Factor, upon learning that Liberty knew very little about the underlying transaction, did not explain its true nature but simply agreed to provide Liberty with a copy of the contract. At that time, a written contract still had not been executed.

Factor, on the other hand, testified that he told someone from Liberty that the contract

involved an antecedent debt. Factor further stated that he contacted Liberty in January to explore why the bond had not been prorated, as is customary for bonds that guarantee debts. He found that the Liberty representative, Adrian Marshall, did not understand either his question or the nature of the contract that the bond guaranteed. When he asked to speak to the underwriting department in order to clear up the misunderstanding, Liberty refused to permit him to do so.

On January 12, 1989, Rachman and TOA finally executed a written contract. The contract for "repayment of the indebtedness" specified that TOA was to repay Rachman $10,000 per month for the first two years of the contract and approximately $13,000 per month for the third year. At TOA's option, payment would be either in cash, textiles, or profits from new sales contracts solicited for Rachman by TOA. It is unclear whether this contract replaced, amended, or merely memorialized the earlier oral agreement. In any event, Halpern and Factor persuaded a Liberty representative to attach a copy of the contract to the bond and Factor then convinced Liberty to alter the face of the bond to refer to the new contract.

In its attempt to secure Liberty's cooperation in this matter, Rachman revealed little about the arrangement that the bond secured. When Liberty's Adrian Marshall asked Factor whether the contract involved repayment of a loan, Factor responded that TOA owed Rachman some money "from business." TOA was even less candid; when Liberty asked Halpern about the antecedent debt mentioned in the January 12 contract, Halpern responded that it merely referred to the fact that Rachman had prepaid for goods under the agreement.

TOA defaulted under the January 12 contract in early March, 1989. On April 12, Rachman informed Liberty of the default. Liberty refused to pay on the bond, and, on November 2, 1989, Rachman commenced this action. In June, 1993, after almost three years of extensive discovery, Liberty asked for and was granted leave to amend its amended answer to include a defense of fraudulent concealment. Both parties subsequently moved for summary judgment. The district court granted summary judgment in favor of Liberty on its fraudulent concealment defense and denied summary judgment to Rachman. Rachman appealed.

## DISCUSSION

Rachman raises three principal points on appeal. First, Rachman argues that the district court abused its discretion in granting Liberty leave to amend its answer to add the defense of fraudulent concealment. Second, Rachman challenges the district court's conclusion that Rachman engaged in fraudulent concealment as a matter of law. Finally, Rachman argues that it is entitled to summary judgment in its favor since it did not have the opportunity to communicate information to Liberty. We address each contention in turn.

### I. Leave to Amend

 Under the Federal Rules of Civil Procedure, a party may amend its pleading once as a matter of right before a responsive pleading is served or, if no responsive pleading is permitted and the case has not yet been placed on the trial calendar, within twenty days after the pleading is served. After that point, absent written consent from the opposing party, leave to amend must be obtained from the district court. Fed. R.Civ.P. 15(a). However, Rule 15(a) specifies that "leave shall be freely given when justice so requires." *Id.* The Supreme Court has emphasized that amendment should normally be permitted, and has stated that refusal to grant leave without justification is "inconsistent with the spirit of the Federal Rules." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Accordingly,

> [i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . ., etc.—the leave sought should, as the rules require, be "freely given."

*Id.* Delay alone unaccompanied by such a "declared reason" does not usually warrant

denial of leave to amend. *See State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir.1981). In light of this preference that amendments be permitted, it is rare for an appellate court to disturb a district court's discretionary decision to allow amendment.

■ Here, Liberty moved to amend its answer more than four years after the complaint was filed. While Liberty's reasons for the delay are not entirely clear, Rachman has offered no reason, such as prejudice or bad faith on Liberty's part, to call the district court's decision into question. Liberty apparently included the defense of fraud in its original answer, and only withdrew it after stating that it still suspected fraud but required discovery to substantiate its claim. In addition, the principal issue in the case changed several times during the four years of litigation. The district court first identified the central issue as whether Liberty's agent had authority to alter the bond; it then redirected the parties to consider whether the February 15 contract materially altered the earlier written agreement. Liberty's tardiness may well have been due to its uncertainty as to what issue to focus on rather than bad faith. Given this history, we do not find the district court's exercise of discretion improper.

## II. Rachman's Duty to Disclose Material Information

Rachman also challenges the district court's conclusion that Rachman's conduct constituted fraudulent concealment as a matter of law. The district court described a three-part test for determining whether an obligee's failure to inform a surety of material facts amounts to fraudulent concealment. To meet this test, the district court stated, a defendant must show "i) facts known to the obligee that materially increase the risk to the surety, beyond that which the obligee has reason to believe the surety intends to assume; ii) knowledge by the obligee that such facts are unknown to the surety; and iii) opportunity on the part of the obligee to communicate the relevant information to the surety." *Rachman Bag Co. v. Liberty Mutual Ins. Co.*, 839 F.Supp. 998, 1003 (E.D.N.Y.1993). The district court's test

finds support from the American Law Institute's Restatement of Security. *See* Restatement (First) of Security § 124(1) (1941). We conclude that under New York law, however, this test lacks an essential fourth element: a duty on the part of the obligee to disclose the relevant information. Because there is a genuine issue of material fact as to whether such a duty exists in this case, summary judgment should not have been granted in favor of the surety.

■ In general, it is the duty of sureties "to look out for themselves and ascertain the nature of [their] obligations." *Security Nat'l Bank v. Compania Anonima de Seguros*, 21 Misc.2d 158, 190 N.Y.S.2d 820, 823 (Sup.Ct. 1959), *aff'd*, 10 A.D.2d 872, 199 N.Y.S.2d 532 (1960). Underlying this duty is the notion that, as stated in *Cam–Ful Industries v. Fidelity & Deposit Co.*, 922 F.2d 156 (2d Cir.1991), "[t]he policy behind surety bonds is not to protect a surety from its own laziness or poorly considered decision." *Id.* at 162. As a result, sureties must usually take the initiative and inquire about information they deem important. *Marine Midland Bank v. Smith*, 482 F.Supp. 1279, 1287 (S.D.N.Y.1979) (explaining that "duties of inquiry and awareness fall upon the guarantor"), *aff'd*, 636 F.2d 1202 (2d Cir.1980).

■ When a surety does request information from an obligee, silence on the part of the obligee can amount to fraudulent concealment. *Chemical Bank v. Layne*, 423 F.Supp. 869, 879 (S.D.N.Y.1976) (finding fraud by the obligee while noting that "the element of *inquiry* by the proposed guarantor is crucial" (emphasis in original)). In this case, however, "Liberty failed to make the kind of inquiry of Rachman that arguably would have [led] to disclosure." *Rachman*, 839 F.Supp. at 1003. The principal question of law in this case is thus under what circumstances an obligee's failure to come forward with information it knows to be material constitutes fraud.

■ New York cases have repeatedly stated that, absent a request from the surety, silence on the part of the obligee will only amount to fraud where the obligee had an affirmative "duty to tell what it allegedly

withheld." *Marine Midland,* 482 F.Supp. at 1288; *see* 63 N.Y.Jur.2d *Guaranty & Suretyship* § 181. This principle is expounded in *First Citizens Bank & Trust Co. v. Sherman's Estate,* 250 A.D. 339, 294 N.Y.S. 131 (1937):

> While in many instances mere silence cannot be made the basis of fraud, yet, where the circumstances are of such a nature as to impose a duty upon one to speak, and where he deliberately fails to do so, his neglect will be deemed a deliberate suppression of the truth, and will amount to constructive, if not actual, fraud.

*Id.* 294 N.Y.S. at 139. The court in *First Citizens* concluded that the obligee bank had defrauded the surety when it failed to disclose that it no longer held collateral for the principal's loan. *Id.*

■ In *Mohasco Industries, Inc. v. Giffen Industries, Inc.,* 335 F.Supp. 493 (S.D.N.Y. 1971), the court specified that the factor distinguishing *First Citizens* from cases where silence did not amount to fraud was the affirmative duty to disclose. *Id.* at 497. This duty is distinct from and independent of the other three parts of the test that the district court utilized. In other words, the fact that an obligee knows information that is material to the surety, is aware of the surety's lack of knowledge, and has the opportunity to communicate the information does not itself give rise to an affirmative duty to disclose it. The court in *Mohasco* held that the obligee on a contract bond was not required to disclose that it intended to terminate its relationship with the principal despite the surety's manifest interest in such information. *Mohasco Indus.,* 335 F.Supp. at 495–96; *see also Cam–Ful Indus.,* 922 F.2d at 161–62 (reiterating that, generally, an obligee is not bound to disclose information absent an inquiry). These cases suggest that the duty to disclose must arise from something other than the materiality of the information.

■ From the relevant New York caselaw there emerges no definitive test for determining when an obligee's duty to disclose material information arises. And as a federal court sitting in diversity, we are reluctant to predict that New York's highest court would establish one. However, New York courts have generally held such a duty to arise when the obligee had either a relationship of trust and confidence with the surety or some degree of responsibility for the surety's misimpression. More specifically, New York courts have pointed to a number of relevant circumstances in decisions holding a duty of disclosure to arise.

■ First, the duty tends to arise when the obligee deals directly with the surety in obtaining the bond. *See* 63 N.Y.Jur.2d *Guaranty & Suretyship* § 180; *cf. Farmer's Nat'l Bank v. Van Slyke,* 1 N.Y.S. 508, 510–11 (1888). Conversely, where the principal obtains the bond and the obligee's contact with the surety is minimal, the duty of inquiry is presumed to belong to the surety. *Security Nat'l Bank,* 190 N.Y.S.2d at 823; *Howe Machine Co. v. Farrington,* 82 N.Y. 121, 126–27 (1880). We note that this consideration taken alone would be unlikely to result in a duty to disclose in the case at bar. Unlike TOA, which obtained the bond directly from Liberty, Rachman had little direct contact with Liberty.

■ An obligee may also have a duty to disclose if silence would amount to an affirmative misrepresentation. *See Marine Midland,* 482 F.Supp. at 1286–87. In *Damon v. Empire State Surety Co.,* 161 A.D. 875, 146 N.Y.S. 996 (1914), one of two cases on which the district court relied in articulating the test for fraudulent misrepresentation, the obligee and principal signed a contract which stated that the principal had possession of the obligee's promissory notes. In fact, the principal had discounted the notes to a third party at the obligee's request. The court suggested that the obligee's signature on the contract was a representation to the surety that the notes were in the principal's possession, and therefore that the obligee's silence as to the truth constituted fraud. *Id.* 146 N.Y.S. at 997–98. Similarly, in *First Citizens,* the obligee bank sent the surety a letter listing in detail the collateral it held for the principal debtor. *First Citizens,* 294 N.Y.S. at 136–37. The court held that the bank's failure to mention that it had released a large proportion of the collateral amounted to fraudulent concealment. *Id.* 294 N.Y.S. at

139. The bank had a duty to correct the false impression "for which the bank was largely, if not wholly, responsible." *Id.* In essence, if the obligee affirmatively creates a misimpression, it seems to have the duty to correct it. Here, the issue of whether the communications between Rachman and Liberty or the wording of the January 12 agreement between Rachman and TOA amounted to affirmative misrepresentations must be resolved at trial.

■ If, as in this case, it is the principal rather than the obligee who misleads the surety, the obligee may still be obligated to disclose facts if it colluded in the deception. In *Damon,* for example, the obligee itself had convinced the principal to transfer the notes to third parties. *Damon,* 146 N.Y.S. at 998. In *General Crushed Stone Co. v. State,* 19 N.Y.2d 737, 279 N.Y.S.2d 190, 225 N.E.2d 893 (1967), the Court of Appeals supported the finding of the trial court and the dissenting judges in the Appellate Division that the obligee and principal had schemed to foist deficits in payments to suppliers and laborers onto the surety. 19 N.Y.2d at 737, 279 N.Y.S.2d at 191, 225 N.E.2d 894; *General Crushed Stone Co. v. State,* 23 A.D.2d 250, 260 N.Y.S.2d 32, 38 (1965) (Gibson, P.J. & Taylor, J., dissenting), *rev'd,* 19 N.Y.2d 737, 279 N.Y.S.2d 190, 225 N.E.2d 893 (1967). In contrast, the Court of Appeals in an 1874 case denied a fraudulent concealment defense where the obligee was "in no way connected with the deception practised upon [the surety]." *Casoni v. Jerome,* 58 N.Y. 315, 321 (1874). As the record presently stands, we cannot conclude as a matter of law that Rachman colluded with TOA to induce Liberty to cover TOA's debt.

■ Courts have also found a duty to disclose material information when the principal was the obligee's employee or agent. *Cf. Grumman Allied Indus. v. Rohr Indus., Inc.,* 748 F.2d 729, 738–39 (2d Cir.1984) (noting that under New York law a duty to disclose material information generally arises when the parties enjoy a fiduciary relationship and one party possesses superior information). In particular, several cases hold that when an employer obligee obtains a fidelity bond for an employee principal, the employer has the duty to disclose that employee's past acts of infidelity. *See, e.g., United States Life Ins. Co. v. Salmon,* 36 N.Y.S. 830, 831 (App.Div.1895), *aff'd,* 157 N.Y. 682, 51 N.E. 1094 (1898); *Bostwick v. Van Voorhis,* 91 N.Y. 353, 360 (1883). While this principle would seem possibly to lend itself to cases such as the present one, recent decisions have strictly limited the duty to the fidelity bond context. *See State v. Peerless Ins. Co.,* 67 N.Y.2d 845, 847–48, 501 N.Y.S.2d 651, 653, 492 N.E.2d 779, 781 (1986) (explaining that the nature of fidelity bonds is such that the employer requesting one is making an implied representation as to the employee's fidelity).

■ Finally, a duty to disclose may arise if the obligee has unique access to material information. In *First Citizens,* the court noted that only the obligee bank was in a position to know that the bank had released the principal's collateral, and that as a result the bank had a duty to disclose that fact. *See First Citizens,* 294 N.Y.S. at 136, 139. Yet this duty arises only if the information is in the obligee's control. That the information is merely difficult for the surety to obtain is not sufficient. In *Marine Midland,* the surety approached the obligee bank and stated that it was having difficulty obtaining information from the principal. Even so, the court found that the bank's selective disclosure did not constitute an affirmative misrepresentation amounting to fraud. *See Marine Midland,* 482 F.Supp. at 1286, 1289.

■ The test for fraudulent concealment by a surety bond obligee under New York law in this context thus consists of four elements: 1) the obligee must know facts that materially increase the surety's risk, and have reason to believe that surety would be unwilling to assume such a higher risk; 2) the obligee must have reason to believe that such facts are unknown to the surety; 3) the obligee must have the opportunity to communicate the relevant information to the surety; and 4) the obligee must have the duty to disclose the information based upon its relationship to the surety, its responsibility for the surety's misimpression, or other circumstances.

■ Because the district court's test for fraudulent concealment in the present case omitted the duty to disclose as an element, the district court did not consider the circumstances found in the caselaw that could give rise to such a duty. In our view, genuine issues of material fact exist as to whether sufficient circumstances existed here to trigger a duty on Rachman's part to disclose in this case. As a result, neither Rachman nor Liberty is entitled to summary judgment on the fraudulent concealment defense. We therefore reverse the district court's grant of summary judgment to Liberty on the issue of fraudulent concealment.

III. Rachman's Opportunity to Communicate Information

■ Rachman further argues that it was entitled to summary judgment as a matter of law even assuming it was under a duty to disclose. Rachman contends that because the bond was irrevocable as soon as TOA obtained it on December 9, it did not have the opportunity to communicate material information to Liberty and thus could not have engaged in fraudulent concealment. This argument fails because its premise is incorrect.

■ A surety's guarantee is not effective until it is delivered to and accepted by the obligee. *See* 63 N.Y.Jur.2d *Guaranty and Suretyship* §§ 60, 63. This requirement holds true even if the principal rather than the obligee obtains the bond from the surety; in that situation, delivery and acceptance by the obligee are necessary for the obligee's rights to vest. *See Bostwick v. Van Voorhis,* 91 N.Y. at 360 (determining whether there was sufficient acceptance by the obligee for a bond procured by the principal); *cf.* 63 N.Y.Jur.2d *Guaranty and Suretyship* § 64 (discussing modes of acceptance).

■ Rachman is correct in stating that for "absolute" guarantees, which unconditionally guarantee a specific transaction, no notice of the obligee's acceptance is required to make the guarantee binding. *See Niles Tool–Works Co. v. Reynolds,* 4 A.D. 24, 38 N.Y.S. 1028, 1029 (1896). Yet even though notice of acceptance is not required for absolute guarantees, actual delivery and acceptance are. *See Smith v. Dann,* 6 Hill 543,

544 (N.Y.App.Div.1844); *City Nat'l Bank v. Phelps,* 86 N.Y. 484, 493 (1881); 63 N.Y.Jur.2d *Guaranty and Suretyship,* § 63. The bond is not unalterable by the parties and fully binding on the surety until the obligee manifests some assent to the guarantee.

In this case, the bond was simply delivered to TOA on December 9, 1988. Whether or not TOA's fax of a copy of the bond to Rachman constituted delivery, nothing could possibly be construed as constituting acceptance on Rachman's part until mid-January at the earliest, when Rachman's counsel called Liberty to inquire about the bond. *See Rachman,* 839 F.Supp. at 999. Given this initial lack of acceptance, the trial court did not err in finding that, if Rachman had a duty to disclose material information to Liberty, it had ample opportunity to do so.

Furthermore, even if Rachman had accepted the guarantee, Liberty was likely not liable on the bond as originally issued in light of later modifications. In *Hall & Co. v. Continental Casualty Co.,* 34 A.D.2d 1028, 310 N.Y.S.2d 950 (1970), *aff'd,* 30 N.Y.2d 517, 330 N.Y.S.2d 64, 280 N.E.2d 890 (1972), the court found that a bond that referred to a contract which had not yet been finalized did not bind the surety. *See id.* 310 N.Y.S.2d at 952. It also noted that once a surety is bound, any subsequent modification of the guarantee discharges the obligation. *See id.* It is possible to conclude, as Judge Korman did, that Liberty was not bound until the parties executed the contract that the bond purported to secure. Alternatively, Liberty may have been bound on December 9, but the substitution of the January 12 contract discharged the earlier obligation and created a new one. In either case, Rachman would have had ample opportunity to disclose material information before Liberty's obligation matured. Given these possibilities, we cannot conclude that Rachman was entitled to summary judgment.

CONCLUSION

For the reasons explained above, we find that the district court did not abuse its discretion in granting defendant leave to amend

its amended answer. We reverse the district court's order of summary judgment in favor of defendant, hold that the district court properly denied summary judgment to plaintiff, and remand for proceedings consistent with this opinion.