**MANUFACTURERS HANOVER TRUST COMPANY, Plaintiff–Appellee,**

v.

**Nicholas YANAKAS, Defendant–Appellant,**

**Charles Buonincontri and Camille Buonincontri, Defendants.**

**No. 1512, Docket 92–9148.**

United States Court of Appeals, Second Circuit.

Argued June 14, 1993.

Decided Oct. 18, 1993.

Jamie M. Brickell, New York City (Pryor, Cashman, Sherman & Flynn, Manuel W. Gottlieb, on the brief), for plaintiff-appellee.

**312**

David A. Field, New York City (Ira A. Turret, Field, Lomenzo, Turret & Blumberg, on the brief), for defendant-appellant.

Before: KEARSE, PRATT, and MINER, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Nicholas Yanakas appeals from a final judgment of the United States District Court for the Southern District of New York, John F. Keenan, *Judge*, ordering him to pay plaintiff Manufacturers Hanover Trust Company ("MHT" or the "Bank") $1,036,381.42 on its claim for enforcement of Yanakas's personal guarantee of certain loans. The district court (a) dismissed three of Yanakas's affirmative defenses and counterclaims, which asserted that Yanakas had been fraudulently induced to sign the guarantee, on the ground that the guarantee stated that it was "absolute and unconditional," (b) dismissed Yanakas's remaining affirmative defenses and counterclaims, which asserted that the Bank had breached its fiduciary duty, on the ground that the answer failed to show the existence of such a duty, and (c) granted summary judgment in favor of the Bank. On appeal, Yanakas contends that the district court erred in dismissing his affirmative defenses and counterclaims and in granting summary judgment against him. For the reasons below, we affirm in part, vacate in part, and remand for further proceedings with respect to the defenses of and counterclaims for fraudulent inducement.

## I. BACKGROUND

The present lawsuit arises out of loans from MHT to Advance Ring Manufacturers, Inc. ("ARM"), which, prior to December 1986, was owned in part by defendant Charles Buonincontri ("Buonincontri") and in part by one Arthur Abraham. Since this appeal centers on the sufficiency of Yanakas's affirmative defenses and counterclaims, we take the allegations of the defenses and counterclaims as true. The following description of the events is taken largely from those allegations.

### A. The Events

In December 1986, Buonincontri and Abraham entered into an auction to determine which of them would purchase the other's interest in ARM. Buonincontri won the auction and became president of ARM. Prior to the auction, Yanakas had made a loan of $250,000 to ARM to help Buonincontri finance his proposed purchase of Abraham's shares. In June 1987, Yanakas converted his initial loan to capital and paid ARM an additional $250,000, thereby acquiring a 25% interest in the company. In 1988, he made further loans and capital contributions totaling $500,000 and acquired an additional 25%; in October of that year, he became the owner of all issued and outstanding shares of ARM.

MHT had entered into a lending relationship with ARM in 1985. At the time of the December 1986 auction, ARM was indebted to MHT in an amount that the Bank places at $700,000. In April 1987, the Bank loaned ARM an additional $350,000 (the "1987 loan"), in connection with which it obtained financial information and personal guarantees from Buonincontri and his wife, defendant Camille Buonincontri.

In 1987 and part of 1988, ARM obtained financing from both MHT and National Westminster Bank ("NatWest"). Initially, both banks were unsecured creditors. Yanakas asserts that in early 1988, however, NatWest surreptitiously obtained the signature of Buonincontri to a document that, unbeknownst to Yanakas, Buonincontri, and ARM, converted NatWest's unsecured position into one secured by the assets of ARM.

On March 31, 1988, MHT told Yanakas that the Bank would call its loans to ARM and would cease to finance ARM's operations unless Yanakas signed a personal guarantee of the loans and paid down part of ARM's outstanding balance. In reliance on these representations and on the Bank's promise to continue financing ARM if he complied with its demands, Yanakas (a) paid $100,000 of ARM's 1987 loan, (b) invested an additional $200,000 in ARM, and (c) executed a personal guarantee of all of ARM's obligations to MHT, agreeing, in part, as follows:

[Yanakas] hereby *absolutely and unconditionally guarantees to Bank the prompt*

*payment of claims of every nature and description of Bank against Borrower ... and any and every obligation and liability of Borrower* to Bank or another or others of whatsoever nature and howsoever evidenced, whether now existing or hereafter incurred, originally contracted with Bank and/or with another or others and now or hereafter owing to or acquired in any manner, in whole or in part, by Bank, or in which Bank may acquire a participation, whether contracted by Borrower alone or jointly and/or severally with another or others, whether direct or indirect, absolute or contingent, secured or not secured, matured or not matured. (All of foregoing are hereinafter referred to as "Obligations").

. . . .

Guarantor waives any and all notice of acceptance of this guarantee or the creation or accrual of any of said Obligations. . . . *This guarantee shall be a continuing, absolute and unconditional guarantee of payment regardless of the validity, regularity or enforceability of any of said Obligations or purported Obligations. . . .*

(Guarantee of All Liability and Security Agreement, dated March 31, 1988 ("Guarantee"), at 1 (emphasis added).) Unbeknownst to Yanakas, on the day that he executed the Guarantee, MHT also got Buonincontri, as ARM's president, to execute a new demand promissory note to MHT in the amount of $550,000 (the "1988 note").

In April 1988, after learning of NatWest's security interest in ARM's assets, Yanakas urged MHT to purchase that interest, for which Yanakas would put up $700,000, roughly the amount of the debt to NatWest, as security. Yanakas stressed the need for a prompt response in order to allow ARM to process orders for the 1988 Christmas season. The Bank promised to consider the proposition but delayed acting on it, and eventually rejected it. Shortly after acquiring Yanakas's Guarantee, the Bank ceased funding ARM's operations and demanded repayment of all ARM loans.

ARM was ultimately unable to obtain adequate financing for the 1988 Christmas season, and it filed for bankruptcy.

B. *The Present Lawsuit and the Opinion Below*

In 1990, MHT commenced the present action against Yanakas and the Buonincontris as guarantors of its loans to ARM. MHT sought $210,000, the outstanding balance on the 1987 loan, plus interest, and $550,000 plus interest on the 1988 note. Yanakas, while denying knowledge of the precise details of ARM's indebtedness to the Bank, asserted five affirmative defenses and counterclaims against the Bank. His first three affirmative defenses and counterclaims alleged that MHT had induced him to sign the Guarantee (1) by affirmatively representing that if Yanakas complied with its demands, the Bank would not call its loans to ARM and would continue to finance ARM's operations, and (2) by concealing from him material information, including (a) the fact that on the day it extracted the Guarantee from Yanakas, the Bank had Buonincontri sign the 1988 note for $550,000, (b) the fact that the Bank had discovered that, beginning in late 1986, the Buonincontris had misrepresented their financial circumstances, and (c) the fact that the Bank had no intention of continuing to provide financing to ARM:

31. Upon information and belief, at the time Yanakas' guarantee was requested; (a) the Bank had discovered that NatWest had been given a secured position in the assets of ARM; (b) the Bank had also discovered that Charles and Camille had given the Bank a false financial statement in late 1986, which did not reflect [a $1,000,000] mortgage on their home; (c) the Bank had decided to terminate the loans to ARM and not to continue financing ARM but to seek Yanakas' guarantee before it made its position public; (d) the Bank had assigned ARM's loans to its "workout" department which, upon information and belief, was for problem loans which the Bank wanted to liquidate rather than continue; and (e) the Bank had previously released Abraham's guarantee.

32. None of the foregoing significant and material facts were made known by the Bank to Yanakas prior to the time that Yanakas signed the guarantee. Had Yanakas been advised of any of said facts, he would not have signed the guarantee.

(Answer ¶¶ 31, 32.)

Yanakas's fourth and fifth affirmative defenses and counterclaims alleged that the Bank controlled the finances of ARM, that Yanakas had no other financial options, and that a relationship of trust and confidence therefore existed between MHT and ARM. Yanakas alleged that the Bank had breached its fiduciary duty to ARM and Yanakas by not responding promptly to, and by then rejecting, Yanakas's proposal that MHT purchase NatWest's position. He alleged that while delaying its response, the Bank never had any intention of forbearing from calling ARM's loans or of continuing to finance its operations; that the Bank had already taken an internal step toward liquidation of those loans; and that

> [t]he Bank acted in a heavy-handed, commercially unreasonable and grossly negligent manner without regard to the rights of Yanakas or ARM, in bad faith, and willfully and maliciously by not accepting the aforesaid proposal, in delaying in acting on the proposal, and in demanding payment of the loans to ARM. The Bank's acts caused ARM to file for bankruptcy resulting in a total loss of Yanakas' investment and loans to ARM.

(Answer ¶ 48.)

Yanakas requested rescission of the Guarantee, $300,000 in compensatory damages on account of his payment of $100,000 on ARM's loans and his last capital contribution of $200,000, and $7.5 million in compensatory damages because the Bank's actions caused ARM to terminate its business, depriving Yanakas of his investment and his expected profits. He also requested $7.5 million in exemplary damages.

MHT moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss Yanakas's counterclaims for failure to state a claim on which relief can be granted. It moved pursuant to Fed. R.Civ.P. 12(f) to strike his affirmative defenses as immaterial. In an Opinion and Order dated February 20, 1992, 1992 WL 35880, ("Dismissal Order"), the district court granted MHT's motions. Citing *Citibank, N.A. v. Plapinger,* 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985), the court dismissed Yanakas's first three affirmative defenses and counterclaims, ruling that "under New York law fraudulent inducement is not a valid defense to enforcement of a[ ] guarantee which, by its terms, is 'absolute and unconditional.'" Dismissal Order at 6. "Because the guarantee that Yanakas signed states that it [is] 'absolute and unconditional,' the defense of fraudulent inducement is unavailable to Yanakas." *Id.* at 6–7. The court also dismissed Yanakas's fourth and fifth affirmative defenses and counterclaims, rejecting his contention that the debtor-creditor relationship between ARM and the Bank was fiduciary in nature, and concluding that Yanakas had failed to allege any facts that would have created a duty on the part of MHT to respond to or accept Yanakas's April 1988 proposal within a particular period of time. *Id.* at 9.

MHT promptly moved for summary judgment on its claim against Yanakas. In an Opinion and Order dated July 31, 1992, 1992 WL 196789, ("Summary Judgment Decision"), the district court granted the motion, stating that despite his affirmative defenses Yanakas had "admit[ted] all relevant allegations upon which [his alleged] liability is premised," and had "fully acknowledged his guarantee of ARM's outstanding debt to MHT." Summary Judgment Decision at 3. Since the affirmative defenses had been stricken, the court concluded that Yanakas's "[a]dmission of this debt and the execution of a guarantee for the full extent of that debt le[ft] no unresolved genuine issue of material fact to be addressed." *Id.* at 3–4. Further finding no genuine issue to be tried as to the amount of the debt, the court ruled that MHT was entitled to judgment against Yanakas for $1,036,381.42, representing a total of $760,000 outstanding on the two ARM debts, plus accrued interest.

Noting that the Buonincontris had filed for bankruptcy, thereby delaying the resolution of any claims against them, the court ordered that a final judgment be entered in favor of

MHT against Yanakas pursuant to Fed. R.Civ.P. 54(b). This appeal followed.

## II. DISCUSSION

On appeal, Yanakas contends principally that the district court erred in ruling (1) that the fact that his Guarantee stated that it was "absolute and unconditional" precluded his claims of fraudulent inducement, and (2) that the Bank had no fiduciary duty to accept or respond promptly to his proposal to restructure ARM's debts. For the reasons below, we agree in part with the first contention but reject the second.

### A. The Claims of Fraudulent Inducement

██ Under New York law, which by the terms of the Guarantee governs this diversity action, if a contract recites that all of the parties' agreements are merged in the written document, parol evidence is not admissible to vary, or permit escape from, the terms of the integrated contract. *See, e.g., Fogelson v. Rackfay Construction Co.,* 300 N.Y. 334, 340, 90 N.E.2d 881, 884 (1950). Such a general merger clause is ineffective, however, to preclude parol evidence that a party was induced to enter the contract by means of fraud. *See, e.g., Sabo v. Delman,* 3 N.Y.2d 155, 161–62, 164 N.Y.S.2d 714, 717–19, 143 N.E.2d 906 (1957); *Bridger v. Goldsmith,* 143 N.Y. 424, 428, 38 N.E. 458, 459 (1894) (general rule is that "fraud vitiates every transaction"). Thus, even when the contract contains "an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made," a party may escape liability under the contract by establishing that he was induced to enter the contract by fraud. *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 320, 184 N.Y.S.2d 599, 601–02, 157 N.E.2d 597, 598–99 (1959) ("*Danann*"); *see also id.* at 320–21, 184 N.Y.S.2d at 601–02 (citing, *inter alia, Sabo v. Delman* and *Bridger v. Goldsmith*).

██ When, however, the contract states that a contracting party disclaims the existence of or reliance upon specified representations, that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations.

*See Citibank, N.A. v. Plapinger,* 66 N.Y.2d 90, 94–95, 495 N.Y.S.2d 309, 311, 485 N.E.2d 974, 976 ("*Plapinger*"); *Danann,* 5 N.Y.2d 317, 320–21, 184 N.Y.S.2d 599, 602, 157 N.E.2d 597, 599. In *Danann,* the purchaser of a lease on a building sought damages for fraud, claiming that it had entered into the contract of sale as a result of the selling defendants' false representations "as to the operating expenses of the building and as to the profits to be derived from the investment." *Id.* at 319, 184 N.Y.S.2d at 600, 157 N.E.2d at 598. The contract itself, however, stated that " '[t]he Seller has not made ... any representations as to the ... *expenses* [or] *operation....* [of] the aforesaid premises ... and the Purchaser hereby *expressly acknowledges that no such representations have been made ....*' " *Id.* at 320, 184 N.Y.S.2d at 601, 157 N.E.2d at 598 (emphasis in *Danann*). The contract also stated that all of the parties' understandings and agreements were merged in the contract, " '*neither party relying upon any statement or representation,* not embodied in this contract, made by the other.' " *Id.* (emphasis in *Danann*). The *Danann* court, after noting that a general and vague merger clause would not bar parol evidence to support a fraud claim, ruled that the fraud claim in the case before it was barred by the purchaser's express disclaimer in the contract of any reliance on that specific representation. "[P]laintiff has in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded. Such a specific disclaimer destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon these contrary oral representations...." *Id.* at 320–21, 184 N.Y.S.2d at 602, 157 N.E.2d at 599.

In *Plapinger,* the court applied the *Danann* principle to an "absolute and unconditional" guarantee of a company's debts given by corporate officers in connection with an agreement by the plaintiff banks to restructure the company's indebtedness. The guarantee stated that its " 'absolute and unconditional' " nature was " 'irrespective of (i) any lack of validity ... of the ... Restated Loan Agreement ... or any other agreement or

instrument relating thereto', or '(vii) any other circumstance which might otherwise constitute a defense' to the guarantee." *Plapinger,* 66 N.Y.2d at 95, 495 N.Y.S.2d at 312, 485 N.E.2d at 977. Following a default by the corporation, the banks brought suit to enforce the guarantee against the officers. The officers sought to defend by alleging that they had been induced to enter into the guarantee agreement by the plaintiff banks' fraudulent representation that the banks had committed themselves to providing the corporation an additional line of credit.

The *Plapinger* court, while confirming the traditional principle that a general merger clause is insufficient to bar a defense of fraud in the inducement, *see id.* at 94–95, 495 N.Y.S.2d at 311, 485 N.E.2d at 976, affirmed the dismissal of the guaranteeing officers' fraud defense on the ground that it was inconsistent with their specific recitals in the contract. First, though noting that the guarantee before it was "not the explicit disclaimer present in *Danann,* " the *Plapinger* court observed that the guarantee was by no means a generalized boilerplate clause but rather was a "multimillion dollar personal guarantee" that was signed "following extended negotiations between sophisticated business people." 66 N.Y.2d at 95, 495 N.Y.S.2d at 312, 485 N.E.2d at 977.

Second, the court found that the "substance" of the guarantee encompassed not only the financing agreements for the debtor corporation, but also " 'any other agreement or instrument relating thereto,' " which included the guarantee itself. *Id.* Thus, the officers had agreed that their guarantee was "absolute and unconditional irrespective of any lack of validity or enforceability *of the guarantee,*" *id.* at 92, 495 N.Y.S.2d at 309, 485 N.E.2d at 974 (emphasis added), and "irrespective of . . . any other circumstance which might otherwise constitute a defense" with respect to the guarantee, *id.* The court concluded that if it were to allow the officers to plead fraudulent inducement of the guarantee, it would in effect condone a fraudulent representation by the officers themselves of their own intentions vis-à-vis the guarantee. *See id.* at 95, 495 N.Y.S.2d at 312, 485 N.E.2d at 977; *see also Danann,* 5 N.Y.2d at 323,

184 N.Y.S.2d at 604, 157 N.E.2d at 600 (same).

Following *Danann* and prior to *Plapinger,* this Court noted that in order to be considered sufficiently specific to bar a defense of fraudulent inducement under *Danann,* a guarantee must contain explicit disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim. *See Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729 (2d Cir.1984). We stated that "[t]he *Danann* rule operates where the substance of the disclaimer provisions tracks the substance of the alleged misrepresentations." 748 F.2d at 735. Given the *Plapinger* court's emphasis on the fact that the defendants there had negotiated an agreement in which they expressly waived any challenge to the validity of the guarantee itself, we are of the view that the ruling in *Plapinger* does not materially alter the principle established by *Danann.*

This view is supported by many state court decisions since *Plapinger* that have ruled that the mere general recitation that a guarantee is "absolute and unconditional" is insufficient under *Plapinger* to bar a defense of fraudulent inducement, and that the touchstone is specificity. Thus, where specificity has been lacking, dismissal of the fraud claim has been ruled inappropriate. *See, e.g., Zaro Bake Shop, Inc. v. David,* 176 A.D.2d 721, 721, 574 N.Y.S.2d 803, 804 (2d Dep't 1991) (mem.) (" 'absolutely and unconditionally' liable . . . language, in and of itself, was . . . insufficient to preclude . . . proof of fraud in the inducement"); *DiFilippo v. Hidden Ponds Associates,* 146 A.D.2d 737, 737–38, 537 N.Y.S.2d 222, 223–24 (2d Dep't 1989) (mem.) (contract provision not a bar to fraud-in-inducement claim where contract provision "d[id] not specifically disclaim reliance on any oral representation concerning the particular matter as to which plaintiff now claims he was defrauded"); *GTE Automatic Electric Inc. v. Martin's Inc.,* 127 A.D.2d 545, 546–47, 512 N.Y.S.2d 107, 108 (1st Dep't 1987) (mem.) (recitation that underlying notes are absolute and unconditional does not bar proof of fraud in inducement of guarantee since there was "not . . . a specific dis-

claimer, as in both *Plapinger* and *Danann Realty* and, therefore, the principle of those cases does not apply"); *Goodridge v. Fernandez*, 121 A.D.2d 942, 945, 505 N.Y.S.2d 144, 147 (1st Dep't 1986) (mem.) (defendant Fernandez, sued on his guarantee, not barred from asserting fraud-in-inducement defense because, "in sharp contrast to the guarantee in [*Plapinger* ], [Fernandez's guarantee] contains no specific disclaimer of defenses available to the guarantor with respect to the guarantee").

Where the fraud claim has been dismissed, the disclaimer has been sufficiently specific to match the alleged fraud. *See, e.g., Manufacturers Hanover Trust Co. v. Restivo*, 169 A.D.2d 413, 414, 564 N.Y.S.2d 141, 141 (1st Dep't) (mem.) (claims that "MHT representative fraudulently represented that [defendants'] guarantees were *temporary and conditional* upon MHT's advancing sufficient funds to consummate a business merger are barred by the language of the guarantees stating that they were *continuing and unconditional* " (emphasis added)), *appeal dismissed*, 77 N.Y.2d 989, 571 N.Y.S.2d 914, 575 N.E.2d 400 (1991); *First City National Bank & Trust Co. v. Heaton*, 165 A.D.2d 710, 711–12, 563 N.Y.S.2d 783, 783–84 (1st Dep't 1990) (mem.) (guarantee barred fraud-in-inducement defense that was "in direct contradiction to the[ ] specific acknowledgement" made in the guarantee); *Marine Midland Bank, N.A. v. CES/Compu–Tech, Inc.*, 147 A.D.2d 396, 397, 537 N.Y.S.2d 818, 819–20 (1st Dep't 1989) (mem.) (contractual disclaimer in which defendant expressly "waive[d] . . . the right to assert defenses, setoffs and counterclaims . . . in any action or proceeding in any court arising on, out of, under, by virtue of, or in any way relating to this Note *or the transactions contemplated hereby* " (emphasis added) was "sufficiently specific to foreclose the defense of fraudulent inducement"). *But see Bank Leumi Trust Co. v. Block 3102 Corp.*, 180 A.D.2d 588, 589, 580 N.Y.S.2d 299, 300 (1st Dep't) (mem.) ("The language of the guarantees specifies that they are absolute and unconditional, negating the claim of fraudulent inducement. . . .") (precise language of guarantees not disclosed in opinion), *appeal denied*, 80 N.Y.2d 754, 587 N.Y.S.2d 906, 600 N.E.2d 633 (1992).

■ In the present case, Yanakas's Guarantee is, for the most part, significantly different from the guarantee at issue in *Plapinger*. First, there is no indication that the Yanakas Guarantee, which is in a preprinted form, is anything but a generalized boilerplate exclusion. The form was one that MHT apparently used routinely; an affidavit submitted by MHT's counsel in support of the Bank's motion to dismiss the affirmative defenses and counterclaims attached copies of an identical MHT guarantee form executed by others in connection with financing unrelated to ARM. There was no evidence that the scope or character of the Guarantee was the product of any negotiations between the parties.

More importantly, the Yanakas Guarantee does not purport to waive any defenses to its own validity. Rather, the Guarantee states that Yanakas "absolutely and unconditionally guarantees" all "obligation[s] and liabilit[ies] of Borrower to Bank or another or others," and states that the "guarantee shall be a continuing, absolute and unconditional guarantee of payment regardless of the validity, regularity or enforceability of any of *said Obligations* " (emphasis added). The term "Obligations" is explicitly defined in the Guarantee with reference only to obligations of ARM. Thus, the Yanakas Guarantee contains no disclaimer as to the validity, regularity, or enforceability of the Guarantee itself. It also contains no disclaimer of the existence of or reliance upon representations by MHT, no express reference to any promise of continued financing, and no blanket disclaimer of the type found in *Plapinger* as to "any other circumstance which might otherwise constitute a defense" to the Guarantee.

■ One of Yanakas's bases for claiming fraud in the inducement, however, is barred by the Guarantee. Yanakas alleged that the Bank had failed to disclose to him its same-day procurement of the $550,000 note signed by Buonincontri. The Guarantee, however, expressly covers ARM debts "whether now existing or hereafter incurred," and expressly "waives any and all notice of . . . the creation . . . of any of said Obligations." These terms are sufficiently specific to pre-

clude any claim that the Bank defrauded Yanakas by failing to disclose the existence or imminence of the 1988 note.

In other respects, the Guarantee given by Yanakas does not, in words or substance, contain disclaimers of the representations that formed the basis of his claim of fraudulent inducement. Accordingly, the decision of the district court to dismiss the first three affirmative defenses and counterclaims must be vacated. The court's ruling that MHT was entitled to summary judgment against Yanakas, premised as it was on the dismissal of those defenses, must likewise be set aside.

### B. *The Remaining Counterclaims*

■ Yanakas's fourth and fifth affirmative defenses and counterclaims, which center on his April 1988 proposal to restructure ARM's debt by having MHT purchase NatWest's security interest, asserted that MHT's rejection of, and failure to respond promptly to, his proposal constituted a breach of MHT's fiduciary duty. His challenge to the district court's dismissal of these claims is without merit.

■ Under New York law, the "usual relationship of bank and customer is that of debtor and creditor," *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 122 (2d Cir.1984); *see Bank Leumi Trust Co. v. Block 3102 Corp.*, 180 A.D.2d at 589, 580 N.Y.S.2d at 301, "and does not create a fiduciary relationship between the bank and its borrower or its guarantors," *id.* Though in unusual circumstances, a fiduciary relationship may arise even between a bank and a customer if there is either "a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding," *Fisher v. Bishop*, 108 N.Y. 25, 28, 15 N.E. 331, 332 (1888), or an assumption of control and responsibility, *see, e.g., Gordon v. Bialystoker Center & Bikur Cholim, Inc.*, 45 N.Y.2d 692, 698, 412 N.Y.S.2d 593, 596, 385 N.E.2d 285, 287–88 (1978), the mere fact that a corporation has borrowed money from the same bank for several years is insufficient to transform the relationship into one in which the bank is a fiduciary, *see Aaron Ferer & Sons Ltd. v.*

*Chase Manhattan Bank, N.A.*, 731 F.2d at 122.

Seeking to avoid the application of this well-established principle, Yanakas relies on *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir.1985) ("*K.M.C.*"). His reliance is misplaced. *K.M.C.* involved an agreement by Irving Trust Co. ("Irving") to extend the debtor a $3.5 million line of credit, in consideration of which the debtor assigned all of its business receipts to an account to which only Irving had access. Thus, the debtor had an express agreement for a certain sum of credit, and Irving had control over assets of the debtor, impeding the debtor from seeking new financing. The Sixth Circuit held that, in these circumstances, Irving's termination of the line of credit without advance notice breached an implied covenant of good faith. This Court has held that the fiduciary obligation found in *K.M.C.* is not present where a bank has "never represented that credit of a certain amount would be provided, and [the borrower] had no reasonable expectation of continued, much less expanded, credit." *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1058 (2d Cir.1992).

Yanakas's answer did not allege any facts sufficient either to convert MHT's position from that of creditor into that of fiduciary or to liken his circumstances to those in *K.M.C.* The answer did not allege that MHT controlled the assets or operations of ARM or that MHT otherwise exercised powers beyond those of a typical lender-creditor. Yanakas did not allege that MHT had agreed to provide ARM with any certain amount of financing. He did not allege any agreement by MHT to Yanakas's proposed restructuring of ARM's debt, nor any representations by MHT suggesting that it would agree to that proposal. Though Yanakas alleged that ARM was unable to find financing elsewhere, there was no allegation that ARM's agreements with MHT precluded ARM from making a search for such financing or that the Bank failed to give proper notice of its decision to cease providing financing. We agree with the district court that Yanakas failed to allege any facts showing a fiduciary duty on the part of the Bank.

## CONCLUSION

We have considered all of the contentions of the parties in support of their respective positions on this appeal and, except as indicated above, have found them to be without merit. We vacate so much of the judgment of the district court as dismissed Yanakas's first three affirmative defenses and counterclaims and granted judgment in favor of MHT; we affirm so much of the judgment as dismissed the fourth and fifth affirmative defenses and counterclaims; and we remand to the district court for further proceedings not inconsistent with the foregoing.

No costs are awarded at this time. In the event that Yanakas ultimately prevails on any of his affirmative defenses or counterclaims, the district court may award him the costs of the present appeal.