WESTRM–WEST RISK MARKETS, LTD., Plaintiff,

v.

LUMBERMENS MUTUAL CASUALTY COMPANY, Universal Bonding Insurance Company, XL Reinsurance America, Inc., and Greenwich Insurance Company, Defendants.

No. 02 Civ.7344 MGC.

United States District Court, S.D. New York.

April 19, 2004.

---

Kasowitz, Benson, Torres & Friedman, L.L.P., New York, NY, By: Michael Fay, Marc Youngelson, Kim Conroy, for WestRM–West Risk Markets Ltd.

LeBoeuf, Lamb, Greene & MacRae, L.L.P., New York, NY, By: Larry P. Schiffer, Kevin Schroth, for XL Reinsurance America, Inc. and Greenwich Insurance Co.

## OPINION

CEDARBAUM, District Judge.

WestRM–West Risk Markets, Ltd. ("WestRM") sues for payment under four surety bonds issued by defendants Greenwich Insurance Company ("Greenwich") and XL Reinsurance America, Inc. ("XL Reinsurance").[1] After limited discovery, WestRM moved for summary judgment. For the following reasons, the motion is granted.

### Background

The following facts are undisputed, except where specifically noted.

In late 2001, Willis Group, Inc. ("Willis"), an English insurance broker, approached WestRM, a Swiss reinsurance company, with a proposal for a series of transactions intended to provide professional liability insurance to National Program Services, Inc. ("NPS"), a New Jersey-based insurance management company.[2] The terms of the transactions that the parties eventually negotiated were as follows. NPS would obtain an insurance policy from Drummonds Insurance PCC Limited ("Drummonds"), an insurance company wholly owned by Willis and located in the Guernsey Islands. WestRM agreed in a series of three "premium finance agreements" ("PFAs"), to pay the premiums on the policies. This was accomplished by means of a "Quota Share Reinsurance Policy," by which WestRM reinsured the policies issued by Drummonds. NPS agreed, in return, to repay WestRM in scheduled installments over a three-year period.

WestRM demanded that NPS obtain surety bonds to secure the amounts NPS owed to WestRM under the PFAs. The first PFA, secured by a bond issued by Lumbermens Mutual Casualty Company ("Lumbermens"), is not at issue here. The second and third PFAs were each secured by two bonds issued by defendants Greenwich and XL Reinsurance as joint and several sureties. The third PFA named Apartment Investment Management Company, Inc. ("AIMCO") as a co-beneficiary of the agreement along with NPS, and the two bonds securing that PFA named AIMCO as a co-principal.[3] The four bonds secured a total of $25.1 million for the benefit of WestRM. Those are the bonds at issue on this motion.

No evidence was presented of any contact between WestRM and defendants dur-

---

1. Its claims against Lumbermens and Universal Bonding Insurance Company have been settled and dismissed.

2. Defendants claim that the transactions were not intended to provide NPS with insurance, but to cover pre-existing losses that NPS sustained through the insolvency of its insurance carrier.

3. Another entity, Universal Bonding Insurance Company, also acted as co-surety on the two bonds securing the obligations of the third PFA. Its role in the issuance of these bonds is not in dispute.

ing the negotiation and execution of the bonds.

By their terms, the bonds would remain in effect until NPS and AIMCO made all scheduled payments under each related PFA. If the principals failed to make a payment, the bonds required WestRM to send a formal written demand for payment to defendants. Defendants would then be obligated to pay WestRM the amount of the demand within thirty days. Each of the bonds contained a New York choice-of-law provision.

NPS paid the installments due under the first two PFAs, but, beginning in April 2002, they failed to pay the installments due on any of the PFAs. Neither NPS nor AIMCO made payments thereafter. WestRM demanded payment from NPS pursuant to the second PFA and from NPS and AIMCO pursuant to the third PFA, but received no further payments. WestRM then demanded from defendants the amounts owed by NPS and AIMCO. Defendants refused to pay. WestRM filed this action, and shortly thereafter moved for summary judgment. That motion was denied to permit limited discovery in connection with a disparity of dates on the first PFA and the Lumbermens bond. After completion of that discovery, WestRM renewed its motion for summary judgment.

### Discussion

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The judge's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether a genuine issue of fact exists, a court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *In re Chateaugay Corp.*, 10 F.3d 944, 957 (2d Cir.1993). Nonetheless, "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

In cases involving notes, guaranties, and surety bonds, an obligee establishes its prima facie case by demonstrating the execution of the obligation at issue, the underlying agreement, and the defendant's failure to pay. *See Orix Credit Alliance, Inc. v. Bell Realty, Inc.*, No. 93 Civ. 4949(LAP), 1995 WL 505891, at *3 (S.D.N.Y. Aug.23, 1995); *see also Valley Nat'l Bank v. Greenwich Ins. Co.*, 254 F.Supp.2d 448, 453 (S.D.N.Y.2003). The party opposing summary judgment may defeat the motion only by asserting defenses that raise genuine issues of material fact. *See id.* at 454.

WestRM has demonstrated execution of the PFAs, insurance policies, and surety bonds at issue. Defendants concede that they have not fulfilled their payment obligations under the bonds. Defendants assert several affirmative defenses which, they claim, defeat WestRM's prima facie case and preclude summary judgment. First, defendants make a number of claims of fraudulent concealment—specifically: (1) that WestRM colluded with others to conceal that the PFAs were really loans; (2) that WestRM knew but failed to dis-

close NPS's unstable financial condition; and (3) that WestRM suspected but did not inform defendants that AIMCO's signatures on the documents were forged and that AIMCO may not have received consideration for the obligations it incurred under the third PFA. Second, defendants argue that irregularities in the transactions void their obligations under the bonds.

Defendants also request additional discovery on these issues pursuant to Fed. R.Civ.P. 56(f). The Second Circuit has established a four-part test for assessing whether a party opposing summary judgment has made a sufficient showing pursuant to Rule 56(f) to justify granting further discovery:

> The affidavit must include the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of material fact; what efforts the affiant has made to obtain those facts; and why those efforts were unsuccessful.

*Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994) (citing *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy,* 891 F.2d 414, 422 (2d Cir.1989)). In their Rule 56(f) affidavit, defendants claim that further discovery will permit them to gain information regarding how the PFAs were disguised as simple loans, whether AIMCO's signatures on the third PFA and related bonds were forged, and when WestRM was aware of the alleged forgeries. Defendants propose to propound interrogatories and seek documents from WestRM, AIMCO, NPS, Willis, and others who, they claim, possess specific knowledge of these facts. Defendants claim that they have repeatedly attempted to gain information about the transactions from WestRM and have been rebuffed.

### I. *Defendants' Fraud Defenses*

Greenwich and XL Reinsurance make three claims of fraud. First, they claim that WestRM knew about and participated in a scheme developed by NPS and Willis to disguise as premium financing arrangements what were really a series of loans intended to cover NPS's existing losses, in order to induce defendants to bond the transactions. Unlike loans, insurance premium payments would not appear as liabilities on NPS's balance sheet. NPS could therefore erase those existing liabilities from its books and create an illusion of financial health. According to defendants, had they known the true nature of these agreements, they never would have issued the bonds, since guaranteeing a loan is inherently riskier than guaranteeing the repayment of insurance premiums because of the increased risk of default.

As evidence of WestRM's knowledge of or participation in this scheme, defendants offer documents that, they claim, show that WestRM's lawyers questioned whether the transactions involved were insurance premium financing, or actually loans; that WestRM agreed during negotiations that the full amount of the policy funds would be released immediately to NPS (which is contrary to the terms of the PFA); and that WestRM and Willis structured the third PFA to create an illusion of risk transfer.

Second, defendants contend that WestRM knew that NPS failed to disclose $19.05 million in liabilities in financial statements that it released pursuant to the transaction. Defendants offer as proof an e-mail exchange among WestRM executives and Willis representatives that indicates a concern that the absence of the liability in NPS's financial disclosures might void the transactions. Defendants argue that NPS's weak financial condition materially increased their risks and that WestRM had a duty to disclose this information to them.

Third, defendants argue that WestRM questioned whether AIMCO's signatures on the transaction documents were valid and whether AIMCO received consideration for participating in the third PFA, but never informed defendants of its concerns. WestRM requested that NPS obtain a power of attorney from AIMCO, but ultimately accepted a letter of authorization provided by NPS and purportedly signed by the chief operating officer of AIMCO. AIMCO now claims that the signatures are forged. WestRM also expressed a concern to Willis representatives that the third PFA could be void if AIMCO did not receive consideration. According to defendants, instead of investigating the problem, WestRM directed that language reciting AIMCO's receipt of consideration be inserted in the PFA. Defendants argue that by failing to disclose its concerns to them, WestRM may have fraudulently concealed information that materially increased defendants' risks.

## A. The Effect of the Waiver Clause on Defendants' Claims

■ The viability of defendants' claims of fraud depends on the scope of a clause contained in each bond which purports to waive any defenses to enforcement of the bond. The clause, which does not vary in any material respect in the four bonds, reads as follows:

> The Surety's liability under this bond shall not be released, discharged or affected in any way (except as expressly provided in this Bond) by any circumstances or condition (whether or not the Surety shall have knowledge thereof), including without limitation: (a) the attempt or the absence of any attempt by the Obligee to obtain payment or performance by the Principal or any other surety or guarantor of the Financial Obligations; (b) any voluntary bankruptcy, or involuntary bankruptcy, insolvency, reorganization, arrangement, readjust-

ment, assignment for the benefit of creditors, composition, receivership, liquidation, marshaling of assets and liabilities or similar events or proceedings with respects to the Principal (each an "Insolvency Proceeding"), or any action taken by Obligee, any trustee or receiver by any court in any such proceeding; and (c) any other circumstances which might otherwise constitute a legal or equitable discharge or defense of the Surety, except as provided under this Bond. The Surety hereby expressly waives and surrenders any defense to its liability under this bond based upon any of the foregoing acts, omissions, agreements, waivers or matters. It is the purpose and intent of this Bond that the obligations of the Surety hereunder shall be absolute and unconditional under any and all circumstances, except to the extent provided in this bond.

The leading New York case discussing whether a waiver clause can bar equitable defenses is *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985). In *Plapinger*, the officers and directors of United Department Stores, who had personally guaranteed a line of credit for the corporation, claimed that they had been fraudulently induced to execute the guarantee by plaintiffs' oral representations. The New York Court of Appeals held that a waiver of defenses clause in the guarantee foreclosed that defense. In an earlier case, *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959), the court had determined that a clause in a contract for the purchase of a building lease, by which the purchaser had acknowledged that the seller made no representations concerning the condition of the building and disclaimed reliance on any representations outside the contract, was sufficient to bar the purchaser's defense of fraudulent inducement based on alleged fraudulent representa-

tions. *See id.* The Court of Appeals recognized that the clause in *Plapinger* did not specifically disclaim reliance on representations by the plaintiff, but noted that the clause was not a "generalized boilerplate exclusion," either, *Plapinger,* 66 N.Y.2d at 95, 495 N.Y.S.2d 309, 485 N.E.2d 974. Rather, it was "a multimillion dollar personal guarantee proclaimed by defendants to be 'absolute and unconditional,'" and was the result of "extended negotiations between sophisticated business people." *Id.* As such, the court held that the clause precluded the defendants from avoiding their obligations by claiming that fraud vitiated the transaction.

The Second Circuit applied *Plapinger* in *Manufacturers Hanover Trust Co. v. Yanakas,* 7 F.3d 310 (2d Cir.1993), to reach the opposite conclusion, holding that a waiver clause in a personal guarantee of loans made to the guarantor's corporation did not bar a claim of fraudulent inducement by the individual guarantor. The court noted that the guarantee at issue differed significantly from the *Plapinger* guarantee: it was a "generalized boilerplate exclusion," it was not the product of negotiation, and it did not waive defenses to its own validity. *See id.* at 317. The court also pointed out that the guarantee did not specifically disclaim reliance on representations by the plaintiff, "contain[ed] no disclaimer of the existence of or reliance upon representations by [plaintiff], ... and no blanket disclaimer of the type found in *Plapinger."* *Id.* The court concluded that "a guarantee must contain explicit disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim," because the "touchstone is specificity." *Id.* at 316.

Defendants rely on *JPMorgan Chase Bank v. Liberty Mutual Ins. Co.,* 189 F.Supp.2d 24 (S.D.N.Y.2002), to support their argument that the waiver clause in these bonds does not bar their fraud de-

fenses. In *JPMorgan,* defendants had issued bonds to guarantee what they believed were sales of gas and oil by Enron Corporation to Mahonia Limited and Mahonia Natural Gas Limited ("Mahonia"). In reality, according to defendants, the transactions were simple loans from plaintiff's predecessor, the Chase Manhattan Bank ("Chase"), to Enron, which were disguised as asset sales so that Enron could book them as revenue. Chase loaned Mahonia the money to purchase the gas and oil from Enron, and Enron secretly agreed to repurchase the same gas and oil from Mahonia-controlled entities, at a price equal to what Mahonia owed Chase. Defendants claimed that only by disguising the loans could Chase and Mahonia induce them to guarantee the transactions. *See id.* at 26. The court held that broad disclaimers in the bonds did not waive this claim of fraudulent inducement. *See id.* at 27–28. This conclusion was based largely on the fact that when the defendants had negotiated the disclaimers, they were completely unaware that other parties were negotiating separate agreements that transformed the asset sales into loans. In this case, defendants make no claim that WestRM engaged in secret transactions with NPS or any of the other parties that turned the PFA into something other than what it appeared to be on its face. Instead, defendants' fraud claim is based in large part on information that is apparent from the transaction documents themselves. Accordingly, *JPMorgan* does not support defendants' arguments that the waiver clause in the bonds does not waive their equitable defenses.

In *Valley National,* Judge Marrero held that a waiver clause identical to the ones at issue in this case barred a defense of fraudulent inducement by the same defendants—Greenwich and XL Reinsurance—in a case involving similar transactions. *See Valley National,* 254 F.Supp.2d at 452

n. 3. Drawing on the reasoning of *Plapinger* and *Yanakas,* Judge Marrero found that the clause was a product of negotiation among sophisticated business entities, noting that Greenwich and XL Reinsurance had in fact drafted the language of the clause. *Id.* at 458. Refusing to hold that *Yanakas's* requirement of specificity is applicable in all cases, he reasoned that the requirement was intended to protect the less sophisticated party in a transaction. Accordingly, specificity is less important where "the drafter and more sophisticated party in the transaction now claims that the disclaimer is too broad and not specific enough." *See id.* Similarly, the fact that the clause in question did not disclaim defenses to its own validity was not relevant, because the fraud claim asserted by defendants did not seek to challenge the validity of the bond, but of the transaction memorialized in the underlying documents. *See id.* at 459. Finally, the court held that the clause's blanket disclaimers were sufficient to cover the fraudulent inducement defenses at issue. The bond's language demonstrated that "both parties had an opportunity to further clarify and carve out any additional exceptions for liability they wanted to make, but ended up settling for the inclusive language of the disclaimer waiver." *Id.*

*Valley National* is persuasive authority for the proposition that the waiver clauses in these bonds bar defendants' claims of fraud. Although no evidence presented here suggests that Greenwich and XL Reinsurance drafted these bonds, the fact that another court found that the same defendants did draft identical language in other surety bonds shows, at least, that defendants were familiar with the bond language and were not the unsophisticated newcomers to these transactions that they claim to be. Indeed, the fact that the *Valley National* agreements were executed several months before the bonds issued here decreases the force of defendants'

claim, asserted throughout their papers, that they were latecomers to these negotiations who were never fully informed as to the nature of the transactions.

With respect to defendants' first claim of fraud—that WestRM knew that these transactions were actually loans and either actively concealed or failed to disclose that fact to defendants—the case for waiver is even stronger than in *Valley National.* These PFAs contain language that should have alerted defendants that the financing arrangements in question might be enforceable only as loans. Each PFA contains the following clause:

> It is understood and agreed that if the Policy that is the subject of this Premium Finance Agreement & /or the related Quota Share Reinsurance Policy is cancelled or made null and void or is otherwise unenforceable as a reinsurance contract this Premium Finance Agreement shall automatically be recategorised as and constitute a loan from [WestRM] to NPS.... The two Premium Finance Bonds issued by [defendants] in connection with the transaction will continue to be in place and will not be cancelled for the time any payments under this transaction are outstanding. All documents mentioned are incorporated herein by reference.

Defendants contend that they never would have issued the bonds if they had known that these transactions were actually loans. Clearly, the presence of this language in the PFAs is not a disclaimer by defendants of specific representations by WestRM. But it does indicate that defendants should have been aware of the loan-like structure of the transactions. As sophisticated sureties, defendants could have demanded changes in the language of the disclaimer or of the PFAs that would have protected them from the possibility that the "true nature" of the transactions

they were bonding might be other than as represented. But the language shows that defendants agreed that their obligations would remain in force even if the PFAs were converted into the very transactions they now claim they would have refused to bond. The fact that the transactions have gone awry provides insufficient ground to rewrite the terms of the bond disclaimers, when defendants possessed both the ability to negotiate a narrower disclaimer and some notice that such negotiation might be in order.

Defendants' second and third fraud defenses—namely, that WestRM failed to disclose NPS's shaky financial condition and its own suspicions regarding AIMCO's signature and whether AIMCO had received consideration—are also barred by the waiver clause.

B. *New York Fraudulent Concealment Law*

■ Even if the disclaimer clauses in the bonds did not bar equitable defenses, defendants' claims of fraud would fail. Since there is no evidence of communication between WestRM and defendants, defendants' claim of fraud must be bottomed on fraudulent concealment. But defendants have failed to satisfy New York's test for fraudulent concealment by a surety obligee, which consists of four elements: 1) the obligee must know facts that materially increase the surety's risk, and have reason to believe that surety would be unwilling to assume such a higher risk; 2) the obligee must have reason to believe that such facts are unknown to the surety; 3) the obligee must have the opportunity to communicate the relevant information to the surety; and 4) the obligee must have the duty to disclose the information based upon its relationship to the surety, its responsibility for the surety's misimpression, or other circumstances.

*Rachman Bag v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 237 (2d Cir.1995). There is no definitive test for determining when a duty to disclose arises, but the Second Circuit has noted a variety of circumstances in which such a duty has been found to arise: for example, when the obligee deals directly with the surety in obtaining the bond, when silence would amount to an affirmative misrepresentation (that is, when the obligee has in some way created the misimpression), when the obligee colluded in the deception, when the obligee and surety are in a fiduciary relationship, or when the obligee has unique access to the information (for example, when it has sole control over the information). *See id.* at 235–37; *see also BIG RED BOAT (TWO) Ltd. v. Greenwich Ins. Co.*, No. 00 Civ. 7672(GBD), 2002 WL 1163557, at *4–5 (S.D.N.Y. May 31, 2002); *Gen'l Crushed Stone Co. v. New York*, 19 N.Y.2d 737, 279 N.Y.S.2d 190, 225 N.E.2d 893 (1967).

■ Defendants argue that superior knowledge on the part of an obligee, without more, gives rise to a duty to disclose information to a surety. But the case defendants cite, *Manley v. AmBase Corp.*, 126 F.Supp.2d 743 (S.D.N.Y.2001), involved parties in direct business negotiations with each other—not sureties and obligees who each negotiated separately with the principal and, as here, did not deal with each other directly at all. Superior knowledge satisfies prongs one and two of the *Rachman Bag* test; to hold that it also satisfies prong four would nullify the requirement of a separate duty to disclose. *Rachman Bag* makes clear that more than mere knowledge is required to trigger an obligee's affirmative duty to disclose.

■ *Rachman Bag* further states that "it is the duty of sureties 'to look out for themselves and ascertain the nature of [their] obligations.'" *Id.* at 235 (quoting

*Security National Bank v. Compania Anonima De Seguros*, 21 Misc.2d 158, 190 N.Y.S.2d 820, 823 (Sup.Ct.1959)) (alteration in original). "Sureties must usually take the initiative and inquire about information they deem important." *Id.; see also Cam–Ful Industries, Inc. v. Fidelity & Deposit Co. of Maryland*, 922 F.2d 156, 162 (2d Cir.1991) ("The policy behind surety bonds is not to protect a surety from its own laziness or poorly considered decision."); *Valley National*, 254 F.Supp.2d at 461 (holding that "it is not the duty of [obligee] to perform [sureties'] due diligence on a contract negotiated by and between [sureties] and [insured], and signed by representatives from those entities"); *Marine Midland Bank v. Smith*, 482 F.Supp. 1279, 1287 (S.D.N.Y.1979); *Chemical Bank v. Layne*, 423 F.Supp. 869, 871 (S.D.N.Y.1976).

As discussed below, each of defendants' claimed fraud defenses fails under one or more prongs of the *Rachman Bag* test.

#### 1. *WestRM's Participation in the Structuring of the PFAs*

■ First, defendants claim that WestRM colluded with Willis to disguise simple loans as premium finance agreements, in order to deceive defendants into bonding transactions they otherwise would have rejected as too risky. If true, WestRM's collusion would have triggered its duty to disclose the true nature of the agreements to defendants, and, absent the waiver clause, defendants would have a valid defense to the enforcement of their obligations.

However, defendants have failed to raise a genuine issue of material fact with respect to WestRM's participation in the alleged fraud. Defendants point to a number of documents from WestRM's lawyers advising that the PFAs as drafted might be interpreted by a court as loans or might be otherwise unenforceable as insurance.

WestRM's lawyers also pointed out that it appeared from the documents they were reviewing that the funds would be transferred from WestRM directly to NPS, and questioned whether this was in accordance with the agreements. But these documents only demonstrate WestRM's awareness of the structural problems of the transactions. They do not show that WestRM cured those defects by committing fraud. Moreover, these documents refer either to the first PFA bonded by Lumbermens (to which defendants were not parties) or to drafts of the later PFAs that differed from their final products. That WestRM's lawyers advised the company of potential drafting problems during the process of negotiating multimillion dollar financing arrangements is not surprising, and cannot form the basis of a claim that WestRM fraudulently concealed information from defendants.

Defendants also point to an e-mail sent from Willis to WestRM after the closing of the second PFA and during the negotiation of the third. In this e-mail, Willis's representative explains that because the premium to be paid under the proposed third PFA would exceed the insurer's liability by $1.6 million, no transfer of risk would occur. Therefore, the transaction might not appear to be true insurance. Willis proposed reducing the amount of the premium stated in the policy to ten percent less than the liability limit, and transferring the difference to a separate document, the PFA, where it would appear as a "premium finance fee." This transfer would ensure that WestRM would "achieve [its] desired income levels."

For several reasons, this document fails to raise a genuine issue of material fact with respect to WestRM's active participation in the alleged fraud. First, it is clear from the rest of the e-mail that Willis and WestRM were not attempting to de-

ceive defendants through this maneuvering. The Willis representative begins his e-mail by explaining that Willis's lawyers had questioned whether the previous PFAs contained a risk transfer element, which, he stated, "is of concern to me *even if your position is protected*" (emphasis added). WestRM's position was protected by virtue of defendants' bonds. In other words, this document shows that Willis and WestRM were not concerned that the sureties could avoid their obligations by claiming that the PFAs were loans, not insurance. Accordingly, they would have perceived no need to deceive defendants. The document thus fails to show collusion.

Second, the subsequent PFA and its associated insurance policy do not reflect the plan proposed in this e-mail. The PFA recites a premium amount of $12.5 million, making no mention of a "premium finance fee." The related insurance policy states that its limit of liability is $11 million, and a schedule attached to the policy reiterates both the premium and the liability limit. Like the previous PFAs, the fact that the premium was higher than the liability limit is apparent from the insurance policy, which was explicitly incorporated by reference into the PFA. Even if Willis had proposed, and WestRM had endorsed, a plan intended to conceal the true nature of the transaction from the defendants, the transaction documents do not implement such a plan.

Most importantly, this e-mail reveals nothing that the defendants could not have discerned from the face of the documents. Surely defendants' lawyers could have raised the same concerns about risk transfer that Willis and WestRM's lawyers raised, and defendants could have demanded assurances from the other participants.

Instead, defendants bonded these transactions, and even agreed that their obligations would remain in force if the PFAs were reinterpreted as loans.

Accordingly, nothing in this e-mail or the other documents offered by defendants raises a genuine issue of fact with respect to WestRM's participation in the alleged fraud.

### 2. WestRM's Awareness of NPS's Unreported Liabilities

■ With respect to WestRM's supposed concealment of NPS's shaky financial condition, WestRM points out, and defendants do not dispute, that the report containing a record of NPS's potential $19.05 million liability was publicly filed in the Guernsey Islands as part of the process of obtaining approval for the Drummonds insurance cell created for these transactions. The report was thus part of the record of the transactions. Accordingly, defendants have failed to show that WestRM had any reason to believe that defendants were not in possession of the information.[4] Defendants have also failed to show that WestRM had a duty to disclose this information to them. None of the Second Circuit's examples of situations that may give rise to a duty to disclose apply here: WestRM did not deal directly with defendants, the parties did not have a fiduciary relationship, and WestRM was not responsible for creating defendants' impression that NPS was financially stable. Neither have defendants proffered facts showing that WestRM was in sole control of this information, or that WestRM conspired with others to hide the information from defendants. WestRM learned of possible irregularities in NPS's

---

**4.** Furthermore, the e-mail exchange shows only that one WestRM representative raised the issue, and that another explained that it was no cause for concern. The e-mails do not

demonstrate that WestRM possessed specific information that materially increased defendants' risks.

financial reporting through its own exercise of due diligence. Defendants may not now attempt to avoid their obligations for failing to perform adequate due diligence themselves. *Cf. State v. Peerless Ins. Co.*, 67 N.Y.2d 845, 847, 501 N.Y.S.2d 651, 492 N.E.2d 779 (1986) ("It has long been settled in this State that absent either an express agreement in the surety bond or inquiry by the surety, a creditor has no duty to keep the surety informed of the debtor's financial situation.").

### 3. *WestRM's Concerns about AIMCO*

■ Similarly, WestRM was under no duty to convey to the defendants any concerns it may have had about the authenticity of AIMCO's signatures on the transaction documents. As an initial matter, after questioning the signatures, WestRM sought and obtained assurances from NPS that the signatures were proper. Thus, it is not clear that WestRM *had* any suspicions after its initial concerns were allayed. In addition, defendants have not shown that WestRM had a duty to disclose its concerns to them. Again, defendants rely on WestRM's superior knowledge. But that knowledge resulted from WestRM's scrutiny of the bonds themselves—documents clearly available to defendants. Accordingly, that knowledge is not sufficient to sustain a duty on WestRM's part to disclose its suspicions to defendants.

Defendants also argue that WestRM questioned whether AIMCO received consideration for incurring liability under the third PFA, and resolved the issue by inserting a boilerplate recitation of consideration in the document, rather than by confirming that AIMCO *did* receive consideration pursuant to an agreement with NPS. Again, defendants fail to offer a credible argument for WestRM's duty to disclose this concern.

Much of the information that defendants argue WestRM should have disclosed to them appears to be information apparent from the face of the agreements or information that defendants themselves could have obtained from NPS. Accordingly, defendants have raised no genuine issue of material fact with respect to their fraud defenses.

### C. *Defendants' Request for Discovery*

■ Defendants' request for additional discovery indicates that they seek further exploration of matters relating to the alleged fraud committed by WestRM and others. Because the waiver clauses in the bonds foreclose defendants' fraud defenses, and because defendants have failed to raise a genuine issue of material fact with respect to any of those defenses despite conducting some discovery, they have not shown how further discovery could reasonably be expected to raise genuine issues of material fact. Accordingly, further discovery is unwarranted.

### II. *Defendants' Claims of Irregularities in the Transactions*

Finally, defendants claim to raise issues of fact with respect to two alleged irregularities in these transactions that may make defendants' obligations unenforceable.

■ First, defendants argue that evidence uncovered in the limited discovery permitted thus far suggests that WestRM paid the premium directly to NPS, not to the insurer, Drummonds. Essentially, defendants argue that such payment would amount to a modification of the agreement underlying their obligation sufficiently material to relieve them of their duty to pay under the bonds. *See, e.g., BIG RED BOAT*, 2002 WL 1163557, at *2.

In response to an order dated February 5, 2004, requesting briefing on this issue, WestRM offered several documents indicating that it had, in fact, paid Drum-

monds, not NPS. These include WestRM's internal ledger records showing payments of similar amounts shortly after the execution of each PFA, as well as confirmations from WestRM's American correspondence bank, American Express, showing that the bank made those payments into an account held at Harris Bank in New York by the Royal Bank of Scotland for the benefit of Drummonds. Defendants have failed to rebut this evidence with anything more substantial than the suggestion that WestRM fabricated the evidence. Accordingly, defendants have failed to raise a genuine issue of material fact with respect to WestRM's payments under the PFAs.

Second, defendants argue that if the AIMCO signatures on the third PFA and related bonds are forgeries, then their obligations are void. While defendants do raise an issue of fact by offering the affidavit of an AIMCO official who states that the signatures purporting to be his are not, defendants are incorrect in arguing that they may avoid their obligations to WestRM because a third party's signature was forged. The cases on which defendants rely stand only for the proposition that a party may not be contractually bound when its own signature is forged. *See, e.g., Opals on Ice Lingerie v. Bodylines, Inc.,* No. 99 Civ. 3761(ILG), 2002 WL 718850 (E.D.N.Y. Mar.5, 2002). It is not clear why WestRM should bear the burden of the potential forgery, especially considering that WestRM had no direct dealings with AIMCO, while defendants had a pre-existing indemnity agreement with AIMCO and were therefore in a better position than WestRM to authenticate the signatures directly. Furthermore, New York law is fairly clear that "[i]n an action by a payee against one who has signed a note as surety, it is no defense thereto that the name of one or more of the obligors on such instrument has been forged, though the surety signed the same in the belief that the signatures were gen-

uine, where it appears that the instrument was accepted by the payee without notice of the forgery." *Morris Plan Co. of Albany v. Adler,* 126 Misc. 237, 213 N.Y.S. 227 (Sup.Ct.1925) (applying the rule to an action to enforce payment under a promissory note). Defendants have failed to raise an issue of fact about whether WestRM accepted the bond with notice of the forgery. Accordingly, the possibility that AIMCO's signature may have been forged is no defense to enforcement of the bonds.

Defendants' request for additional discovery on these two issues is also denied.

### Conclusion

For the foregoing reasons, defendants' Rule 56(f) motion for additional discovery is denied, and WestRM's motion for summary judgment is granted.

SO ORDERED.